## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

AUTHENTICOM, INC.

                        Plaintiff,                   Case No. 17-cv-318

       vs.

                                          Redacted Version

CDK GLOBAL, LLC; and THE REYNOLDS
AND REYNOLDS COMPANY

                        Defendants.

---

## AUTHENTICOM'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    Dealer Management Systems ................................................................. 3

    B.    Dealer Data Integration Services ........................................................... 4

    C.    The Dealer Data Integration Market Before February 2015 .................... 7

    D.    Defendants' Agreement To Eliminate Competition in the Dealer
           Data Integration Market ........................................................................ 8

           1.    Defendants' Market Division Agreement ..................................... 9

           2.    Defendants' Agreement To Block Independent Integrators ..... 10

    E.    Exclusive Dealing by CDK and Reynolds .............................................. 13

    F.    The Escalating Harm and Imminent Threat to Authenticom ................. 15

    G.    Harm to Vendors and Dealers ............................................................... 17

    H.    Defendants' Anticompetitive Conduct Has No Pro-Competitive
           Justification ......................................................................................... 19

ARGUMENT .......................................................................................................... 21

    I.    PRELIMINARY INJUNCTION STANDARD ..................................... 21

    II.    DEFENDANTS' HORIZONTAL AGREEMENT TO DIVIDE
          THE MARKET AND EXCLUDE THEIR RIVALS IS A PER SE
          VIOLATION OF SECTION 1 OF THE SHERMAN ACT .................. 22

          A.    Defendant's Written Market Division Agreement Violates
              Section 1 ..................................................................................... 22

          B.    Defendants Conspired To Eliminate Competition in the
              Data Integration Market ............................................................. 23

    III.    PLAINTIFF'S CLAIMS OF UNLAWFUL EXCLUSIVE DEALING,
           UNLAWFUL TYING, UNLAWFUL MONOPOLIZATION, AND
            TORTIOUS INTERFERENCE ARE ALSO LIKELY TO SUCCEED ... 27

A.      Defendants' Exclusive Dealing Agreements Unlawfully
        Foreclose Authenticom from Competing in the Dealer Data
        Integration Market .........................................................................28

        1.      The Foreclosure Effect Is Substantial ...........................................28

        2.      Authenticom Has Direct Evidence of Substantial
                Price Increases and Reduction of Output......................................30

B.      Defendants' Dealer Exclusive Dealing Provisions
        Constitute Illegal Tying .................................................................32

C.      Authenticom Is Likely To Succeed on Its Section 2
        Monopolization Theory ...................................................................36

        1.      Relevant Data Integration Markets and Brand-
                Specific Aftermarkets .....................................................................36

        2.      Monopoly Power.............................................................................37

        3.      Acquisition and Maintenance Through
                Anticompetitive Conduct ................................................................38

D.      Authenticom Is Likely To Succeed on Its Tortious
        Interference Claim .........................................................................39

V.      AUTHENTICOM IS SUFFERING IRREPARABLE HARM
        THAT MONEY DAMAGES CANNOT REDRESS ...........................................40

A.      Defendants' Anticompetitive Conduct Threatens
        Authenticom's Viability..................................................................40

B.      Authenticom Will Suffer Irreparable Harm to Its
        Reputation and Goodwill ................................................................42

C.      The Balance of Harms and Public Interest Favor the
        Preliminary Injunction ...................................................................44

CONCLUSION....................................................................................................47

# TABLE OF AUTHORITIES

Page

CASES

*42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401 (7th Cir. 2002) ................................34

*Black Box Corp. v. Avaya, Inc.*, 2008 WL 4117844 (D.N.J. 2008) ................................37

*Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) ................................38

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ................................23

*Briggs & Stratton Corp. v. Kohler Co.*, 405 F. Supp. 2d 986 (W.D. Wis. 2005) ................................36

*Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781 (Wis. 2006) ................................39

*Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d 928 (S.D. Ohio 2009) ................................37

*Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988) ................................27

*Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*,
    758 F.2d 203 (7th Cir. 1985) ................................33

*Central States, Southeast & Southwest Areas Pension Fund v. Breeko Corp.*,
    1989 WL 153547 (N.D. Ill. 1989) ................................46

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50 (2d Cir. 1997) ................................32

*Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264 (6th Cir. 2015) ................................27

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010) ................................37

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ..........32, 33, 34, 36, 37, 38

*FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392 (1953) ................................29

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134
    (7th Cir. 1994) ................................42, 43

*General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588
    (7th Cir. 1984) ................................27

*George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 1999 WL 1327396
    (D.N.H. 1999) ................................37

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ................................21, 42, 43

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    2016 WL 6091244 (N.D. Ind. 2016) ................................37

iii

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241 (D. Haw.),
  *aff'd*, 203 F.3d 832 (9th Cir. 1999) .......................................................27, 47

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
  582 F.3d 721 (7th Cir. 2009) ...............................................................44

*IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415 (N.D. Ill. 1994) ...........................46

*Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006).............................32

*Intertek USA Inc. v. AmSpec, LLC*, 2014 WL 4477933 (N.D. Ill. 2014)..........................47

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010)..............................23

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ........................32, 33, 34

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995).....................34

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) .................................24

*L. G. Balfour Co. v. FTC*, 442 F.2d 1 (7th Cir. 1971) ...................................29

*Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011 (E.D. Wis. 1999).....................38

*Magnum Radio, Inc. v. Brieske*, 577 N.W.2d 377 (Wis. Ct. App. 1998) .....................40

*Marion Healthcare, LLC v. Southern Illinois Healthcare*, 2015 WL 3466585
  (S.D. Ill. 2015) ...........................................................................28

*McCreery Angus Farms v. American Angus Ass'n*, 379 F. Supp. 1008 (S.D. Ill.),
  *aff'd*, 506 F.2d 1404 (7th Cir. 1974) ....................................................27

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F. 3d 1111 (7th Cir. 1997) ..................21

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176
  (C.D. Ill. 2016), *appeal pending*, No. 16-3791 (7th Cir.)............................29, 38

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)..................................26

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) ...............37

*Northern Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958)......................................32, 33

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
  472 U.S. 284 (1985).......................................................................24

*Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dep't
  of Health*, 699 F.3d 962 (7th Cir. 2012) .................................................44

*Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d 312 (7th Cir. 2006)...................33, 35

*Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44 (7th Cir. 1980) ...........43

*Republic Tobacco Co. v. North Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004) .........28

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984)................................28, 30

*Rozema v. Marshfield Clinic*, 1997 WL 416292 (W.D. Wis. 1997)................................................38

*Saad v. Village of Orland Park*, 2011 WL 6754042 (N.D. Ill. 2011)...........................................21

*Select Creations, Inc. v. Paliafito Am., Inc.*, 911 F. Supp. 1130 (E.D. Wis. 1995)......................40

*SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918 (N.D. Ill. 2007) ............................................43

*Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982),
    *aff'd*, 465 U.S. 752 (1984)......................................................................................................24

*Standard Oil Co. of California v. United States*, 337 U.S. 293 (1949) ...................................29, 44

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F. Supp. 2d 861
    (E.D. Ky. 2007)........................................................................................................................37

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 2011 WL 2473330 (C.D. Ill. 2011),
    *aff'd*, 695 F.3d 676 (7th Cir. 2012)........................................................................................46

*Sulfuric Acid Antitrust Litig., In re*, 703 F.3d 1004 (7th Cir. 2012) ..........................................37

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)......................................................28

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................32

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ..........................................24, 25, 34, 35

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) ....................................................22, 44

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), *cert. denied*,
    136 S. Ct. 1376 (2016)...........................................................................................................27

*United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991)...............................................................23

*United States v. General Motors Corp.*, 384 U.S. 127 (1966).....................................................26

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).....................................29, 37, 38

*United States v. Sealy*, 388 U.S. 350 (1967)...............................................................................22

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).............................................34, 35

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.
    Workers Int'l Union, AFL-CIO-CLC, & Local 9550 v. Cequent Towing*,
    920 F. Supp. 2d 932 (N.D. Ind. 2013) ...................................................................................47

*Ward v. Apple Inc.*, 2017 WL 1075049 (N.D. Cal. 2017) ............................................................37

*Wilk v. American Med. Ass'n*, 895 F.2d 352 (7th Cir. 1990)........................................................32

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)....................................................38

v

STATUTES AND RULES

Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999).......................................19

Sherman Act, 15 U.S.C. § 1 *et seq.* ...........................................................2, 22, 24, 27, 32, 33, 34

    § 1, 15 U.S.C. § 1.............................................................................2, 22, 23, 24, 26, 27, 32

    § 2, 15 U.S.C. § 2.....................................................................................................2, 27, 36, 38

Fed. R. Evid.:

    Rule 801(d)(2)(D) .........................................................................................................25

    Rule 801(d)(2)(E).........................................................................................................25

OTHER MATERIALS

III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (rev. ed. 1996)................................38

President Obama speaks about Stephen Cottrell, President and CEO of
    Authenticom, https://www.youtube.com/watch?v=Bfzu9kd5HU8...................................16

## INTRODUCTION

Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") are the dominant providers of Dealer Management Systems ("DMS"), sophisticated enterprise software that is essential to automobile dealers' operations.  Together, they control more than 70 percent of the DMS market based on dealership "rooftops," and even more based on cars sold.  Once a dealer chooses either CDK or Reynolds as its DMS provider, switching becomes difficult and usually impracticable, giving the companies formidable market power.  Plaintiff Authenticom, Inc. is a provider of data integration services.  With a dealer's authorization, Authenticom pulls the dealer's data stored on the dealer's DMS, organizes it, and provides it (for a fee) to third-party vendors that need that data to provide services to the dealer.  Over the past 15 years, Authenticom built one of Wisconsin's fastest growing businesses, with 120 employees, based on superior service and trusted data security.

Authenticom needs no help from CDK or Reynolds to provide its services; it simply obtains a login and password from the dealer and pulls the dealer's own data from the database (a method that is standard in many industries).  Authenticom can provide its services only if the dealer affirmatively chooses Authenticom over competing service providers and grants it login credentials.  But Defendants have decided that Authenticom should no longer be permitted to serve its dealer customers and that instead Defendants should be the exclusive providers of data integration services for their respective dealers.  They therefore signed a written market allocation agreement and also agreed to block Authenticom's access to dealer data.  Defendants have implemented that agreement by prohibiting dealers from dealing with Authenticom (or other third-party integrators); by barring third-party vendors from dealing with Authenticom (or any data integrator other than CDK or Reynolds); and by affirmatively disabling login credentials that dealers were using to provide data to Authenticom.  As a result of this conduct,

the price of dealer integration services has skyrocketed, vendors have been harmed, dealers have been harmed, consumers have been harmed, and Authenticom is facing imminent collapse.

This Court should grant preliminary injunctive relief to avoid that dire result.  *First*, Authenticom is highly likely to succeed on the merits of its claims: the agreement between CDK and Reynolds is a per se unlawful market division and group boycott that violates Section 1 of the Sherman Act.  The evidence of that agreement – even before discovery – is more than strong.  Defendants put their market division agreement *in writing*.  And executives of Defendants have *told* Authenticom that CDK and Reynolds are working together to block Authenticom's access to dealer data in order to drive it out of business.  Moreover, that blocking conduct would make no sense in the absence of agreement with Reynolds, because CDK had gained a competitive advantage in the DMS market by respecting dealers' authority to control their own data – a position CDK had openly taken for many years, only to reverse course after the market allocation agreement.  Moreover, even on the assumption that Defendants' conduct was unilateral, rather than concerted action, that conduct constitutes unlawful exclusive dealing, tying, and monopolization that violates Sections 1 and 2 of the Sherman Act.

*Second*, in the absence of relief, Authenticom will suffer irreparable harm: the company, which can no longer meet its obligations to its creditors, will likely fold and lose the goodwill it has built up over a decade and a half.  Indeed, as a result of Defendants' boycott, Authenticom is cash flow insolvent, cannot satisfy its obligations to its creditors, cannot obtain additional credit, and will soon have to declare bankruptcy.  A preliminary injunction is needed to ensure the survival of the company.

*Third*, the balance of harms and the public interest favor equitable relief.  The relief that Authenticom seeks – an order barring CDK and Reynolds from blocking Authenticom's access

to dealer data and from enforcing exclusive dealing arrangements with dealers or vendors in order to block Authenticom – imposes no unfair burden on CDK and Reynolds, which will remain free to compete on the merits to provide dealer integration services.  Nor does that relief pose any threat to data security.  Authenticom has never had a cybersecurity incident, and its security precautions are gold standard; indeed, this is why so many dealers for years have chosen to provide Authenticom access to the dealers' own data.  Moreover, Defendants' unlawful conduct is inflicting significant and ongoing harm on thousands of dealerships and application providers across the country, which are facing massive price increases and reduced competition across the data integration market.  Restoring dealer choice and free competition is strongly in the public interest, as is preserving the 120 Wisconsin jobs that would be lost if Authenticom goes out of business.

The motion for a preliminary injunction should be granted.

## STATEMENT OF FACTS

**A.     Dealer Management Systems**

Defendants CDK and Reynolds are – by far – the dominant providers of DMS software in the country.  Statement of Facts in Support of Motion for Preliminary Injunction (hereinafter "SOF") ¶ 4.  DMS software is sophisticated enterprise software that car dealers use to manage virtually every aspect of their businesses, including sales, marketing, inventory, accounting, human resources, and more.  SOF ¶¶ 1-2.  A dealer's DMS is considered the center of a dealer's entire retail management platform; it is impossible to operate without it.  SOF ¶ 2.

For decades, CDK and Reynolds together have dominated the DMS market.  SOF ¶¶ 4-5.  Combined, Defendants control more than 70 percent of the market (measured based on franchised stores, and even more when measured by vehicles sold).  SOF ¶¶ 4-7.  The remainder of the market is made up of mostly small and niche DMS providers.  Defendants' market

position is protected by high barriers to entry – to give one example, Microsoft tried to enter the DMS market in 2006 and failed – and, once a dealership has chosen a DMS provider, it becomes very difficult to switch.  SOF ¶¶ 8-16.  CDK and Reynolds sell their DMS software and services pursuant to long-term contracts, typically between five and seven years, often with automatic extensions if new services are ordered in the middle of the contract.  SOF ¶ 8.  Moreover, once a dealer has built up its operations based on a particular DMS – and trained its workforce to use that system – it is extremely disruptive for a dealer to switch DMS providers.  SOF ¶¶ 9-11.  It can take up to a year of preparation, staff training, and testing before the new system is put into operation.  SOF ¶ 11.  One industry executive compared changing DMS providers "to a heart transplant."  SOF ¶ 13.  As a result of long-term contracts and sky-high switching costs, the *average* DMS client tenure is more than 20 years.  SOF ¶ 15.

**B.      Dealer Data Integration Services**

DMS software includes a database component where dealers input and store their data. SOF ¶ 18.  In operating their businesses, car dealerships must keep track of vehicle and parts inventory, customer name and contact information, completed and pending sales, vehicle financing and insurance information, and much more.  SOF ¶ 17.  That data resides on their DMS database.  SOF ¶ 18.

Dealers depend on various software-based services (known as "applications") that are provided by third-party vendors.  SOF ¶ 19.  For example, vendors may provide specialized inventory management, customer relationship management, electronic vehicle registration and titling, and many other services.  SOF ¶ 20.  A single dealership often uses ten or more separate applications.  SOF ¶ 22.

To provide such services, vendors need access to dealer data.  SOF ¶ 23.  For example, vendors that provide electronic vehicle registration and titling – a critical service that dealers are

legally mandated to provide in some States, including Wisconsin – must be able to obtain purchaser, vehicle, and financing information about the sale of a car.  SOF ¶ 24.[1]

Vendors do not obtain data directly from dealers.  SOF ¶ 26.  Instead, separate companies specialize in extracting dealers' data from their DMS databases, organizing it, and delivering to vendors the specific data required for their applications.  SOF ¶¶ 26-29, 58.  These "data integrators" interpret, reformat, and translate the disparate data into a standardized format.  SOF ¶¶ 27, 58.  They also correct data-entry errors or anomalies in the data set.  SOF ¶ 28. Integrators extract and deliver the data in an automated, seamless way without the need for manual intervention by dealers.  SOF ¶ 29.[2]

At one time, a number of competitors provided data integration services.  SOF ¶ 120. Today, there are only CDK, Reynolds, and Authenticom.  SOF ¶ 122.  As outlined below, Defendants have succeeded in driving every other competitor out of the market.  SOF ¶¶ 122-127.  CDK owns two of the largest integrators, Digital Motorworks and IntegraLink, which provide service to dealers that use DMS systems other than CDK or Reynolds.  SOF ¶¶ 31, 89. CDK also provides data integration services to dealers using the CDK DMS through its "Third Party Access" ("3PA") program.  SOF ¶ 32.  Similarly, Reynolds has an integration product – called the "Reynolds Certified Interface" ("RCI") program – for dealers using the Reynolds DMS.  SOF ¶ 33.[3]

---

[1] Some applications – customer relationship management software, for example – not only require data "pulled" from a dealer's database, but also need to "push" data back in and therefore require "bi-directional" access.  SOF ¶ 25.

[2] While data access providers are commonly referred to as "integrators," there is no actual "integration" with the DMS database.  Instead, "integration" is simply a synonym for data access.  SOF ¶ 30.

[3] Reynolds does not have an independent data integration business that pulls data from other DMS platforms.  SOF ¶ 34.

Authenticom introduced its integration product in 2004 and quickly grew to become a key market participant.  SOF ¶¶ 35, 63.  The current version of Authenticom's integration product is called DealerVault, which gives dealers state-of-the-art control over how their data is pulled and shared.  SOF ¶¶ 64-66.  It provides a unified user interface where dealers, with the click of a button, are able to add, remove, or change the data sets that Authenticom pulls and sends to the dealers' vendors.  SOF ¶ 65.  The service further provides dealers with reports detailing the data Authenticom collected and to whom it was sent, all down to the granularity of a specific data field.  SOF ¶ 66.

Before a data integrator can pull data, it must get specific authorization from the dealer.  SOF ¶ 36.  For integrators like Authenticom, Digital Motorworks, and IntegraLink, dealers must set up separate login credentials for the integrators so that they can access the DMS database to pull the data.  SOF ¶ 37.  Once dealers set up those credentials, the data integrator automates the pulling of data through user emulation software, which uses the database software to run and capture the reports in the same way as a user at a dealership would.  SOF ¶¶ 38, 222.  This method for pulling data – sometimes referred to as "screen scraping" – is standard not only in the dealer data integration market, but also in numerous other industries, such as banking and healthcare, where data must be extracted from databases for use in applications.  SOF ¶¶ 228-230; Declaration of Peter Swire ¶¶ 18-25 (May 17, 2017) ("Swire Decl.").  The user emulation software does not in any way alter the DMS software itself.  SOF ¶ 222.

Dealers retain ownership of their data stored on the DMS database.  SOF ¶ 41.  Reynolds has publicly stated: "The data belongs to the dealers.  We all agree on that."  SOF ¶ 42.  CDK has said the same.  SOF ¶¶ 44-45.  The CDK and Reynolds DMS contracts also spell out that ownership of the data remains with the dealers.  SOF ¶¶ 46-47.  In addition, industry participants

6

far and wide have affirmed that dealers control access to their data, including by permitting data integrators to access it.  SOF ¶¶ 48-55.  CDK's CEO stated: "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant permission, how would you ever go against that wish?"  SOF ¶ 48.  Industry organizations (including the National Auto Dealers Association), dealers themselves, car manufacturers, and others have stated similarly.  SOF ¶¶ 51-55.

Dealers authorize but generally do not pay integrators to pull their data.  Instead, vendors contract with and pay integrators for their services.  SOF ¶ 39.  Authenticom's contracts have one-year terms (though vendors can cancel services at any time).  SOF ¶ 70.  CDK's and Reynolds' vendor contracts are typically three years in length.  SOF ¶¶ 161, 164.  In addition, as detailed below, the prices charged by CDK and Reynolds are far higher than Authenticom's prices – by many multiples – even though the services provided are the same.  SOF ¶¶ 238-255.

## C.     The Dealer Data Integration Market Before February 2015

Until relatively recently, there was a robust market for dealer data integration services, with many competitors.  SOF ¶ 120.  For many years, CDK and Reynolds did not interfere with dealers' use of integrators to pull data from dealers' DMS databases.  SOF ¶¶ 62, 83-84.  Instead, Defendants affirmatively supported the burgeoning integration market and participated in it with their own integration products.  SOF ¶¶ 31-33, 62, 83-84.  In this competitive market, vendors benefited from inexpensive, secure access to dealer data, and there was an explosion of innovation in applications that transformed how dealers conducted their business.  SOF ¶ 121.

Defendants and independent integrators like Authenticom competed head-to-head in the integration market.  For example, CDK (through its Digital Motorworks and IntegraLink subsidiaries) competed with Reynolds in providing integration services for dealers using the

7

Reynolds DMS.  SOF ¶¶ 31-33, 83.  CDK pulled data from Reynolds dealers using the standard process – using dealer-created login credentials.  SOF ¶ 83.  For many years, Reynolds did not block CDK's access to dealer data, just as it did not block Authenticom or other integrators. SOF ¶¶ 84, 107.

Beginning in 2007 – after billionaire Bob Brockman acquired the company – Reynolds changed its position and gradually started to disable login credentials granted by dealers to independent integrators.  SOF ¶ 108.  In 2011 and then again in 2013, however, Reynolds escalated its efforts to block other integrators (including CDK's subsidiaries) from accessing dealer data.  SOF ¶¶ 85-86, 110.  CDK complained to dealers at the time that "Reynolds has instituted policies designed to prevent automated processes such as those used by IntegraLink, [Digital Motorworks,] and other third-party data-collection services from collecting data for programs you have enrolled in."  SOF ¶ 86.  Reynolds' efforts, however, were not entirely successful; Authenticom, CDK, and other integrators worked with dealers to develop workaround solutions that circumvented Reynolds' efforts to block access.  SOF ¶ 87.  Mr. Brockman publicly complained about CDK's practice of competing on the merits in the market for data integration and predicted that eventually CDK would "change that position" and join Reynolds in simply blocking independent integrators' access to dealer data.  SOF ¶ 88.  When CDK made an about face and entered into an illegal agreement with Reynolds to restrict access to dealer data, Mr. Brockman got his wish.

**D.    Defendants' Agreement To Eliminate Competition in the Dealer Data Integration Market**

In early 2015, unbeknownst to Authenticom, CDK and Reynolds launched a joint effort to eliminate competition in the provision of dealer data integration services.  SOF ¶ 134.  That agreement had two basic components.  First, Defendants entered into a formal, written market

8

division agreement in which they promised not to compete in providing data integration services. SOF ¶¶ 134-148.  Second, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data.  SOF ¶¶ 173-187.  The agreement has thus given CDK exclusive control over the provision of data integration services for dealers using the CDK DMS, and Reynolds the same for dealers using the Reynolds DMS.  SOF ¶ 133.

1.     **Defendants' Market Division Agreement.**  As described above, for more than a decade, CDK provided data integration services for dealers using the Reynolds DMS, competing directly with Reynolds' own RCI integration product.  SOF ¶¶ 83-87.  Effective February 18, 2015, however, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete for that business.  SOF ¶¶ 134-135.  The agreement's key provision states that CDK "███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████."  SOF ¶ 139.  In short, CDK agreed to no longer provide any "███████████████████████████████████ █████████████████" any vendor.  *Id.*  The agreement granted CDK a "█████████ ██████" of one year to stop providing integration services for Reynolds dealers.  SOF ¶ 140. During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer.  *Id.*

The agreement also mandated coordination between the erstwhile competitors in transitioning all of CDK's vendor clients (*i.e.*, those vendors for whom CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program.  SOF ¶ 141.  The agreement specifically required CDK to "████████████████████████" to have vendors "████████ ████████████████████████████████████."  SOF ¶¶ 141-142.  In connection with

9

that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more.  SOF ¶ 143.[4]

**2.      Defendants' Agreement To Block Independent Integrators.**  CDK and Reynolds not only agreed not to compete with each other; they also agreed to prevent their DMS customer dealers from dealing with independent data integrators like Authenticom.  SOF ¶¶ 173-187.  To achieve that result, CDK and Reynolds have disabled login credentials, enforced anti-competitive contract terms against dealers, and required certain competitors to leave the market for data integration services as a condition of allowing those companies' own applications to participate in the 3PA and RCI programs.  SOF ¶¶ 120-127, 156, 170-172, 196-202.  These tactics were successful in eliminating competing data integrators from the market, leaving Authenticom as Defendants' sole competitor.  SOF ¶¶ 120-127.

Having succeeded in eliminating the rest of the competition, CDK and Reynolds have now stepped up their coordinated attacks on Authenticom.  SOF ¶¶ 196-202.  By blocking Authenticom's access to dealer data (despite dealer authorization), Defendants are intent on destroying Authenticom's business.  SOF ¶¶ 173-187.

**a.**      Senior CDK and Reynolds executives have admitted that Defendants have entered into an agreement to restrict access to dealer data and destroy data integrators like Authenticom.  SOF ¶¶ 173-187.  Most dramatically, on April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Steve Cottrell (Authenticom's

---

[4] The market division agreement had a direct impact on Authenticom: during the "wind-down" period, Authenticom lost many customers to CDK's affiliate, Digital Motorworks.  SOF ¶ 148.  Vendors decided to leave Authenticom (which Reynolds was actively blocking) and to join CDK (which was not being blocked) on an interim basis, even if those vendors knew they would ultimately be forced into the RCI program.  *Id.*  This was one of Defendants' purposes for entering into the non-compete agreement: to cooperate in driving vendors away from Authenticom.

owner and CEO) and said that they should "take a walk." SOF ¶ 174. Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. *Id.* Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "lock you and the other third parties out." SOF ¶ 175. In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray confirmed the illegal agreement again, stating that the number was so low because Authenticom's "book of Reynolds business is worthless to us because of the agreement between CDK and Reynolds." SOF ¶ 176. Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." SOF ¶ 177. "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise *I will f\*\*\*ing destroy it*." SOF ¶ 179. Mr. Cottrell rejected Mr. McCray's threats, refused to sell his company for a fraction of its value, and insisted that Authenticom would continue to serve its customers. SOF ¶¶ 180-181.

Top Reynolds executives have delivered the same message. SOF ¶ 184. In May 2015, Robert Schaefer – Reynolds' Director of Data Services and one of the architects of the conspiracy – told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs, and therefore block competitors like Authenticom from pulling dealer data. *Id.* Reynolds' owner, Mr. Brockman, was adamant, Mr. Schaefer said, that all third-party data integrators must be cut off. SOF ¶ 185.[5]

**b.** CDK and Reynolds also have employees coordinating the technical aspects of blocking Authenticom – something that would not be possible in the absence of an agreement

---

[5] Mr. Schaefer also said that he was in communications with other DMS companies to try to convince them to join CDK and Reynolds in the agreement to block independent data integrators. SOF ¶ 186. He has not been successful – every other DMS company recognizes a dealer's right to have Authenticom (and others like CDK-owned Digital Motorworks and IntegraLink) provide data integration services. SOF ¶ 187.

11

between the two companies.  SOF ¶¶ 193-195.  For example, in December 2016, during one vendor's discussions with CDK about joining the 3PA program, Steve French – CDK's senior director of client and data services – told the vendor that a large part of his job was to work with Reynolds to ensure Authenticom remained locked out.  SOF ¶ 193.  Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to block third-party data integrators like Authenticom.  SOF ¶ 194.

     **c.**    As noted above, Reynolds' blocking tactics started earlier and have been more sustained than CDK's, as CDK did not start blocking independent data integrators until it entered into the agreement with Reynolds in 2015.  SOF ¶¶ 85, 196.  Indeed, prior to its agreement with Reynolds, CDK used its open-access policy as a competitive advantage against Reynolds.  SOF ¶¶ 48-51.  Reynolds, by contrast, first started disabling Authenticom's usernames in 2009 when it introduced gimmicks such as "challenge questions" and "captcha" (where the user has to enter random blurred text) to make it more difficult to automate the pulling of data.  SOF ¶ 109.  In June 2013, Reynolds intensified its tactics by disabling Authenticom's usernames en masse.  SOF ¶ 110.  Over a three-month period in the summer of 2013, Reynolds disabled 27,000 profiles used by Authenticom at more than 3,600 dealers.  SOF ¶ 111.  Reynolds' actions resulted in an almost complete collapse of Authenticom's integration business for dealers using the Reynolds DMS.  SOF ¶ 112.

     In recent months, CDK's blocking efforts have intensified.  On August 1, 2016, Authenticom's employees learned that, overnight, CDK had disabled Authenticom's login credentials at thousands of dealerships.  SOF ¶ 196.  A throng of dealers and vendors called Authenticom, frantic to find a way to re-establish Authenticom's connection and resume the flow of data that dealers had authorized.  SOF ¶ 197.  Vendors and dealers alike had their business

operations interrupted.  SOF ¶ 202.  Over the ensuing weeks and months, CDK unleashed wave after wave of blocking actions that disabled Authenticom's login credentials for thousands of dealerships.  SOF ¶ 198.  CDK has informed dealers that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016."  SOF ¶ 199.  CDK then promised that in 2017 it would "further increase our security actions to prevent the use of unapproved data access methods."  *Id.*

### E.    Exclusive Dealing by CDK and Reynolds

CDK and Reynolds have imposed exclusive dealing provisions in dealer contracts (dealers cannot provide access to their data to anyone else) and vendor contracts (vendors cannot obtain dealer data from anyone else).  SOF ¶¶ 149, 158.  For independent data integrators like Authenticom, these exclusive dealing provisions have foreclosed the entire data integration market for dealers using the CDK and Reynolds DMS platforms.  *See* Declaration of Hal J. Singer ¶¶ 5, 20 (May 17, 2017) ("Singer Decl.").

**Dealers.**  Defendants' DMS contracts foreclose dealers from using other integration providers, including Authenticom.  SOF ¶ 149.  Reynolds prohibits dealers from "███████ █████████████████████████████████," while granting Reynolds the sole right "█ █████████████" the dealer's data.  SOF ¶¶ 153, 155.  Similarly, CDK's DMS contract provides that CDK may access dealer data but that dealers "███████████████████████ ████████████" to anyone else.  SOF ¶¶ 150, 152.  CDK and Reynolds vigilantly enforce the restrictive terms in their DMS contracts.  SOF ¶ 156.

**Vendors.**  CDK and Reynolds have also inserted exclusive dealing provisions in their data integration contracts with vendors.  SOF ¶ 158.  As a result, a vendor using CDK or Reynolds for data integration services must agree *only* to use CDK or Reynolds, and forgo using anyone else.  SOF ¶¶ 158-164.

The current CDK 3PA contract states: "███████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████." SOF ¶ 159. The contract goes on to state that the vendor cannot "███████████████████████ ███████████████████████████████████████████████████████ █████████████" *Id.* That specifically prohibits vendors from having Authenticom (or any other integrator or even the dealer itself) provide the data to the vendor. Moreover, the exclusivity provision applies to every software application a vendor has. *Id.* Thus, if a vendor uses CDK's integration product for one application, the vendor must then use CDK for every other application as well. The penalty for accessing dealer data other than through CDK is termination, which would then block that vendor's access to any dealer that uses the CDK DMS. SOF ¶¶ 160-161. These exclusive terms purport to last *forever*, continuing even after the termination of the access agreement. SOF ¶ 161.

Like the CDK 3PA contract, the Reynolds RCI agreement contains exclusive dealing provisions that prohibit vendors from obtaining dealer data from any source except Reynolds. SOF ¶ 163. The RCI agreement states that "██████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████." *Id.* The agreement defines "████ █████████████" as the "█████████" of dealership data obtained in any way other than through the RCI program. *Id.*

CDK and Reynolds also impose price secrecy provisions in their 3PA and RCI contracts prohibiting vendors from informing dealers about the data access fees in any way, whether directly or indirectly, even though the data access fees are passed down to dealers in the form of



higher vendor prices.  SOF ¶¶ 166-169.  For example, the CDK 3PA contract states that vendors cannot provide "████████████████████" to dealers "████████████████████," including "████████████████████" to dealers "████████████████████████████████████████████████████████████████████████████████████████████████████" for data integration.  SOF ¶¶ 167-168.

Defendants aggressively enforce the exclusive dealing and price secrecy provisions against vendors.  SOF ¶¶ 170, 172.  They punish vendors that obtain dealer data from any other integrator, impose large fines, threaten to cancel the contract, and initiate audits.  SOF ¶ 170.  For example, in August 2016, Reynolds sent a letter to a vendor stating that, by using Authenticom for one of its applications, the vendor was "████████████" the RCI contract.  SOF ¶ 171. Reynolds threatened to terminate the contract unless the vendor agreed to "████████████ ████████" from using Authenticom.  *Id.*  Reynolds demanded that the vendor "████████████ ████████████████████████" and demanded "████████████████████████████ ████████" under the agreement's liquidated damages clause.  *Id.*  Reynolds threatened that, if the vendor did not accede to the demands in the letter, "████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████." *Id.*

**F.     The Escalating Harm and Imminent Threat to Authenticom**

The actions that CDK and Reynolds have taken to block Authenticom's access to dealer data have already turned Authenticom from a thriving business to a failing one.  SOF ¶¶ 268-279.  If not enjoined, CDK's and Reynolds' concerted efforts will soon succeed in driving Authenticom from the data integration market entirely, destroying its business and the goodwill it has built over more than a decade.  *Id.*

15

Before Defendants implemented their anticompetitive agreement, Authenticom was an American success story, growing from a single employee in 2002 to 120 employees in 2015, even being singled out by President Barack Obama in a speech in La Crosse on July 2, 2015, as "one of America's fastest growing private companies." SOF ¶¶ 63, 79.[6] Now, less than two years later, Authenticom's business is on the verge of collapse. SOF ¶¶ 268-279. Defendants' efforts to block Authenticom's access to dealers' data, even when Authenticom can eventually work around them, makes it impossible for dealers and vendors – especially those that depend on real-time data access – to continue to work with Authenticom. SOF ¶¶ 231-237. As one large vendor told Authenticom, it was switching to CDK's data integration service "with reluctance" and "solely [as] the result of CDK's aggressive and recurring disablement of our data access credentials." SOF ¶ 233. Another longtime vendor wrote, "After being a loyal client for over six years, we are compelled to make a business decision to pursue Third Party Access from CDK Data Services." SOF ¶ 234. The "disruptions" caused by Defendants' blocking had taken too "serious [a] toll on our dealer business clients causing them to terminate or suspend marketing services with us." *Id.* Another vendor explained that "[b]etween the Reynolds lockouts and the subsequent CDK lock-outs our business has contracted due to dealer cancellations." SOF ¶ 235.

For years, Authenticom suffered customer losses and slower growth because of Reynolds' blocking. SOF ¶ 269. But the recent concerted action of CDK and Reynolds has sharply accelerated Authenticom's losses. SOF ¶ 270. The number of active data feeds that Authenticom has for vendors has declined by almost half. *See* Expert Report of Gordon Klein ¶ 273 (May 17, 2017) ("Klein Report"). Authenticom's profits, as measured by EBITDA, dropped by 77.22 percent from the third quarter of 2015 to the first quarter of 2017. SOF ¶ 272. Defendants' actions have left Authenticom cash flow insolvent, with insufficient earnings and

---

[6] For the President's full remarks, *see* www.youtube.com/watch?v=Bfzu9kd5HU8.

resources to satisfy its outstanding debt obligations.  SOF ¶ 274.  Authenticom was unable to pay

an $11 million principal payment on a loan from BMO Harris Bank due April 16, 2017, and has

received a limited 90-day forbearance – *i.e.*, until July 15, 2017 – from the Bank pending the

outcome of this preliminary injunction motion.  SOF ¶ 275.  Authenticom was also unable to pay

an approximately $1.17 million tax-related obligation due April 18, 2017.  SOF ¶ 276.

Authenticom has sought additional financing from BMO Harris Bank and Citizens State Bank,

but they have declined to provide this financing, citing doubts about Authenticom's continued

viability because of Defendants' actions.  SOF ¶ 277.  And the resulting loss of goodwill –

because of Defendants' blocking, Authenticom cannot perform for its customers – is

incalculable.  SOF ¶ 278.  Absent the emergency injunctive relief sought here, Authenticom will

have no choice but to declare bankruptcy.  SOF ¶ 279.

G.      **Harm to Vendors and Dealers**

Defendants' anticompetitive conduct has not just harmed Authenticom; it has harmed

competition itself – first and foremost through dramatic price increases, but also through reduced

output, degraded product quality, and diminished customer choice.  SOF ¶¶ 238-267.

Due to the elimination of competition, CDK has a nearly 100 percent market share for

dealer data integration services for dealers using the CDK DMS, and Reynolds has the same for

dealers using the Reynolds DMS.  SOF ¶ 133.  CDK and Reynolds have exercised their market

power by imposing enormous price increases on data integration services.  SOF ¶¶ 242-255.

Neither vendors nor dealers have been able to stop or resist these increases.  *Id*.

The price difference between what Authenticom (and other independent data integrators)

charged and what CDK and Reynolds now charge is enormous.  SOF ¶¶ 239-246.  To pull data,

Authenticom has consistently charged vendors – per month per dealership store – $25 for one

data feed and $50 for two or more.  SOF ¶ 239.  For bi-directional access to dealer data,

17

Authenticom has generally charged $75 per month.  SOF ¶ 240.  Other independent data integrators charged similar rates.  SOF ¶ 241.  By contrast, for the same services through their respective 3PA and RCI programs, CDK and Reynolds charge between $250 and $300 for basic data access, and up to $800 for bi-directional access, oftentimes more.  SOF ¶¶ 243-246.[7]

Defendants' prices have dramatically increased since they started to conspire.  SOF ¶¶ 245-246.  For example, before February 2015, CDK charged an average of $70 per connection.  SOF ¶ 246.  Since 2015, CDK's average cost per connection has risen to at least $250 to $300.  *Id.*  This constitutes, at the conservative end, an increase in the range of 250 to 325 percent in the price of data integration services.  *Id.*[8]  Reynolds likewise has raised its prices since February 2015, including by charging many vendors an additional per-transaction fee on top of their already-large monthly fees.  SOF ¶¶ 246, 248.

Because vendors cannot absorb the massive price increases imposed by both CDK and Reynolds, vendors pass most if not all of the increased data integration fees down to dealers.  SOF ¶ 253.  At the same time, and despite this new source of revenue, CDK and Reynolds have done nothing to reduce fees for DMS services.  SOF ¶¶ 256-260.  On the contrary, CDK and Reynolds ratchet up the DMS fees year after year, with no price break to dealers to make up for the pass-through costs for data integration.  *Id.*  Both CDK and Reynolds have fee-escalation

---

[7] In addition to these monthly fees, CDK and Reynolds also charge vendors enormous upfront fees to initiate services.  SOF ¶¶ 249-250.  CDK and Reynolds charge at least $30,000 to join the 3PA and RCI programs, with "setup" fees of around $300 (or more) for every dealership connection.  SOF ¶ 250.  These initiation fees are much more than anything charged by Authenticom and other independent data integrators.  For example, Authenticom collects an upfront fee of $2,500, but that fee is credited against the first invoices.  SOF ¶ 251.  And, unlike Defendants, Authenticom does not charge an additional per-connection setup fee.  *Id.*

[8] Defendants' exorbitant prices stand in stark contrast to the prices CDK charges for data access to non-CDK dealers.  SOF ¶ 247.  Today, CDK charges between $25 and $50 per connection to non-CDK dealers, even though the services are the very same as those provided for access to CDK dealers.  *Id.*

clauses in their DMS contracts with dealers. SOF ¶¶ 258-260. As a result, dealers are hit from both sides: rapidly escalating data integration fees and contractually mandated, annual DMS price hikes. SOF ¶¶ 253-260.

## H.   Defendants' Anticompetitive Conduct Has No Pro-Competitive Justification

Defendants have argued to the industry that their anticompetitive conduct is necessary to protect "data security." SOF ¶ 218. By extension, Defendants have claimed that Authenticom (and all other independent data integrators) are "unsecure" and pose a threat to the security of dealer data. SOF ¶ 217. But as Peter Swire – a preeminent data security and privacy expert – has concluded, "there are no reasonable security and privacy concerns that justify CDK's and Reynolds' wholesale prohibition on the use of independent Data Integrators" like Authenticom. Swire Decl. ¶ 6. Many facts demonstrate that Defendants' "security" rationale is a pretext. SOF ¶¶ 73-78, 218-230.

As an initial matter, CDK and Reynolds have no basis to claim that Authenticom's services are not secure. SOF ¶¶ 73-78. Authenticom has never had a data breach, and its firewall has never been compromised. SOF ¶ 74. Authenticom transfers all data using secured and encrypted protocols that meet or exceed federal standards for federally insured banking transactions. SOF ¶ 75. Authenticom partners with Microsoft Azure cloud services – and has achieved Microsoft's top-level gold security certification three years in a row – to provide dealers with a secure place to syndicate and distribute their data. SOF ¶ 76. Authenticom's information security system exceeds applicable consumer privacy and protection restrictions, including the Gramm-Leach-Bliley Act of 1999 and the Federal Trade Commission's Implementing Rules. SOF ¶ 77. Indeed, Authenticom's contracts with dealers guarantee compliance with those regulatory requirements. *Id*. Finally, Authenticom agrees to indemnify

19

dealers in the event there is any data security event and backs up that promise with a $20 million cyber liability insurance policy.  SOF ¶ 78.

There is nothing unusual or unsecure about independent data integrators like Authenticom.  Swire Decl. ¶ 33.  CDK owns two data integrators – Digital Motorworks and IntegraLink – that pull and syndicate data in the same way as Authenticom: using login credentials provided by the dealer and then transferring the data to vendors.  SOF ¶¶ 31, 37. Indeed, until they entered their agreement in February 2015, CDK pulled data using login credentials from Reynolds dealers, and CDK continues to pull data in this way from dealers using other DMS systems.  SOF ¶¶ 83, 90-91.

Using login credentials to pull data is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from car dealerships. SOF ¶ 228.  Taking the banking industry as an example, thousands of third-party applications – from well-established ones like PayPal, Mint, Square, and Quicken, to new startups like Even – require access to a customer's banking data.  Swire Decl. ¶¶ 20-25.  There are large data integrators like Intuit and Yodlee that pull data from the consumers' bank accounts using login credentials and provide that data to the third-party applications.  *Id*.  As banking experts have summarized, "screen scraping is the only technology that enables all of the thousands of small financial institutions to participate in the data-sharing ecosystem."  SOF ¶ 230.

Tellingly, CDK and Reynolds actually use Authenticom as a data integrator for certain of their own third-party applications.  SOF ¶¶ 225-227.  CDK and Reynolds pay Authenticom to pull data from dealerships using their DMS systems and distribute that data to their applications. *Id*.  The fact that CDK and Reynolds use Authenticom for integration services shows there is nothing "unsecure" about Authenticom's process or security protocol.

At bottom, dealers maintain that they should have the choice to evaluate the security protections of data integrators accessing the dealer's own data and select the one that satisfies their standards.  SOF ¶¶ 52-53.  Defendants cannot take that choice away from dealers under the guise of "security," and then impose massive price increases on data integration.  "This is just a means of revenue generation for CDK," one Florida dealer wrote.  SOF ¶ 255.  "Let me, the client, worry about my data security by using a vendor such as DealerVault.  It should be my choice on how I want to secure my data, not [Defendants']."  *Id.*

## ARGUMENT

## I.   PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, Authenticom must initially establish (1) that it will "suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) that "traditional legal remedies would be inadequate"; and (3) that "its claim has some likelihood of succeeding on the merits."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  "The requirement that plaintiffs show some likelihood of success on the merits is a low threshold, requiring only that plaintiffs' chances of prevailing be 'better than negligible.' "  *Saad v. Village of Orland Park*, 2011 WL 6754042, at *1 (N.D. Ill. 2011) (quoting *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F. 3d 1111, 1114 (7th Cir. 1997)).

Once Authenticom makes these "threshold" showings, the court balances "the potential irreparable harms faced by both parties to the suit – the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted."  *Girl Scouts of Manitou Council*, 549 F.3d at 1100.  In this "balancing phase," courts use a "sliding scale" under which "the more likely [Authenticom] is to win, the less the balance of harms must weigh in [its] favor; the less

likely [Authenticom] is to win, the more it must weigh in [its] favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). Additionally, the balancing phase takes into account the "public interest," including "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties." *Id.*

## II. DEFENDANTS' HORIZONTAL AGREEMENT TO DIVIDE THE MARKET AND EXCLUDE THEIR RIVALS IS A PER SE VIOLATION OF SECTION 1 OF THE SHERMAN ACT

CDK and Reynolds violated the Sherman Act by entering into a per se unlawful conspiracy in which each agreed to refrain from competing against the other for data integration customers and to cooperate in eliminating all third-party competitors in the data integration market. Authenticom has extensive evidence of Defendants' unlawful conduct – not just allegations – that establishes Authenticom's likelihood of success on its Section 1 claim.

### A. Defendants' Written Market Division Agreement Violates Section 1

Defendants' written agreement to divide a substantial portion of the dealer data integration market between themselves constitutes per se unlawful market division. *See United States v. Sealy*, 388 U.S. 350, 357 n.5 (1967) ("[A]lleged market division, . . . like price-fixing, group boycotts, and tying arrangements, has been held to be a per se violation of the Sherman Act."); *see also* Singer Decl. ¶¶ 36-43 (opining that such market division harms competition). As explained above, in February 2015, CDK and Reynolds entered into a formal contract providing that they would no longer compete for the data integration business of Reynolds' DMS customers (they already did not compete for CDK's DMS customers). *See* SOF ¶ 139 (Wind Down Access Agreement § 4.1 ("Agreement") (CDK "███████████████████████████████████████████████████████████████████████████████████████████████████")). Defendants' agreement also provided that CDK would actively steer its existing integration customers that used Reynolds for DMS to

Reynolds for integration.  *See* SOF ¶ 141 (Agreement § 3.1 (CDK agreed to "███████████████ ██████████████████" to have integration customers "███████████████████████████ █████████████████████")).  Defendants' agreement expressly divides the data integration market between the two Defendants – with CDK to serve its DMS customers (comprising approximately 45 percent of the market by dealer count) and Reynolds to serve its DMS customers (comprising approximately 30 percent of the market by dealer count).

Horizontal market division is a "classic per se antitrust violation."  *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991); *accord Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998).  The reason is simple: agreements to *refrain* from competing for a rival's customers "virtually always stifle competition."  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010).  So, too, here.  Prior to 2015, CDK competed to provide data integration services to dealers that purchased DMS services from Reynolds.  But, pursuant to their 2015 agreement, Defendants agreed to divide the data integration market and not to compete for dealers that use the other Defendant's DMS system.  Defendants' written contract, on its own, establishes that Authenticom has a likelihood of success on its Section 1 claim.  But there is much more.

### B.     Defendants Conspired To Eliminate Competition in the Data Integration Market

In addition to Defendants' formal written contract, Authenticom has evidence of explicit statements by high-ranking CDK and Reynolds executives in which they admitted to a concerted effort to eliminate Authenticom as a competitor in the dealer data integration market.  Like market division, a group boycott – *i.e.*, " 'joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle' " – is a per se violation of the

Sherman Act. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *see also Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) (holding that group boycott organized by competing appliance manufacturers and suppliers was per se violation of Section 1); *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1236 (7th Cir. 1982) ("A per se unlawful boycott has two essential elements: "(1) at least some of the boycotters are competitors of each other and the target and (2) the boycott is designed to protect the boycotters from competition with the target."), *aff'd*, 465 U.S. 752 (1984).

Authenticom has amassed substantial evidence – even before discovery – supporting the existence of Defendants' conspiracy.

***First***, senior CDK and Reynolds executives have admitted that they agreed to exclude Authenticom from the market. Authenticom's CEO, Steve Cottrell, will testify that CDK's Vice President of Product Management, Dan McCray, took him aside at an April 2016 industry conference and told him that CDK and Reynolds have agreed to "lock [Authenticom] and other third parties out." SOF ¶ 175. Mr. McCray stated in that same conversation that CDK's new CEO, Brian MacDonald, had mandated that Mr. McCray "seek [Authenticom] out and destroy [Authenticom's] business on [CDK's] systems." SOF ¶ 177. Mr. McCray told Mr. Cottrell that, unless he accepted a low-ball offer to sell the business, he would "f***ing destroy" Authenticom. SOF ¶ 179.

Senior Reynolds executives also have admitted to the existence of Defendants' agreement not to compete with one another and to block all third-party data aggregators. Mr. Cottrell will testify that, during a telephone conversation in May 2015, Reynolds' head of data services, Robert Schaefer, stated that CDK and Reynolds had agreed to support each other's data

integration services by blocking third-party competitors from pulling dealers' data.  SOF ¶ 184.

Mr. Schaefer said that Reynolds' owner and CEO, Bob Brockman, was "adamant" that third-party integrators be cut off.  SOF ¶ 185.  Mr. Schaefer also said that he was in talks with other smaller DMS companies to try to convince them to join CDK and Reynolds in the agreement to block independent data integrators (he has had no success on that score).  SOF ¶¶ 186-187.

These statements – which are admissible against both Defendants for the truth of the matter asserted, *see* Fed. R. Evid. 801(d)(2)(D), (E) – constitute strong evidence of Defendants' unlawful conspiracy.

*Second*, Authenticom has substantial evidence that Defendants engaged in coordinated implementation of their agreed-upon plan to exclude third-party data integrators.  CDK historically had emphasized its support of open-access to dealer data on dealers' DMS databases and had not blocked independent data integrators from accessing the data.  SOF ¶¶ 48-50.  As CDK's CEO stated, so "long as [dealers] grant permission, how would you ever go against that wish?"  SOF ¶ 48.  Indeed, CDK had touted its "open system" as a selling point to compete with Reynolds for dealer DMS customers.  SOF ¶¶ 48-50.  But in 2015, after entering the unlawful agreement with Reynolds, CDK abruptly reversed its longstanding policy and started precluding access by Authenticom by disabling its login credentials and other blocking techniques.  SOF ¶¶ 96-97, 100, 196.  Reynolds, which had engaged in blocking tactics prior to 2015, redoubled those tactics after the parties' agreement.  SOF ¶ 200.

Defendants' sudden shift from product differentiation and competition to lock-step parallel conduct is highly suspicious and strongly corroborates the existence of an unlawful agreement.  *See*, *e.g.*, *Toys 'R' Us*, 221 F.3d at 935 ("[n]ot only was the manufacturers' decision to stop dealing with the warehouse clubs an abrupt shift from the past, and not only is it

suspicious for a manufacturer to deprive itself of a profitable sales outlet, but the record here included the direct evidence of communications"); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764-65 (1984) (finding that "substantial *direct* evidence of agreements" between competitors, combined with parallel action, constituted "evidence that tends to exclude the possibility that the [conspirators] were acting independently").

Moreover, Defendants' own employees have acknowledged that the two companies engaged in *coordinated* blocking activities after they entered into their horizontal agreement in 2015. For example, Steve French – CDK's senior director of client and data services – told one of CDK's vendors in December 2016 that a large part of his job was *to work with Reynolds* to ensure Authenticom remained locked out. This evidence that Defendants, erstwhile competitors, engaged in horizontal coordination in furtherance of the group boycott agreement further demonstrates that Defendants engaged in a per se violation of Section 1. *See*, *e.g.*, *United States v. General Motors Corp.*, 384 U.S. 127, 142-43 (1966) (evidence of Section 1 conspiracy "where . . . joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan").

**Third**, Defendants have entered into and enforced exclusive dealing provisions in their contracts with dealers and vendors. The dealer exclusive dealing provisions prevent any dealer that contracts with CDK or Reynolds for DMS from permitting any third-party data integration provider (such as Authenticom) from accessing the dealers' data on the DMS databases. Similarly, the vendor exclusive dealing provisions preclude any vendor that contracts with CDK or Reynolds from using Authenticom or any other independent integrator to obtain dealers' data.

These vertical restraints between Defendants and their customers not only are independent antitrust violations – *see infra* Part III – but also constitute additional "useful evidence . . . to

26

prove the existence of a horizontal cartel." *United States v. Apple, Inc.*, 791 F.3d 290, 319-20

(2d Cir. 2015); *see Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988)

(noting that a "facially vertical restraint imposed by a manufacturer only because it has been

coerced by a 'horizontal cartel' agreement among his distributors is in reality a horizontal

restraint"; "a restraint is horizontal not because it has horizontal effects, but because it is the

product of a horizontal agreement") (brackets omitted).

In sum, Authenticom has extraordinarily strong evidence – even prior to discovery – that

Defendants engaged in a per se unlawful horizontal conspiracy to divide the data integration

market and exclude all other competitors.  That evidence is far more than sufficient to justify a

preliminary injunction.[9]

## III.   PLAINTIFF'S CLAIMS OF UNLAWFUL EXCLUSIVE DEALING, UNLAWFUL TYING, UNLAWFUL MONOPOLIZATION, AND TORTIOUS INTERFERENCE ARE ALSO LIKELY TO SUCCEED

The likelihood that Authenticom will establish that Defendants entered into an unlawful

market division and group boycott, without more, is sufficient to establish a basis for success on

the merits.  Authenticom's additional claims under Section 1 and Section 2 of the Sherman Act

reinforce the strength of that showing.

---

[9] *See General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984) (upholding preliminary injunction based upon evidence of a horizontal conspiracy under Section 1); *McCreery Angus Farms v. American Angus Ass'n*, 379 F. Supp. 1008, 1016 (S.D. Ill.) (granting preliminary injunction under Section 1), *aff'd*, 506 F.2d 1404 (7th Cir. 1974); *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 280 (6th Cir. 2015) (affirming grant of preliminary injunction on tying claims); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1248-49 (D. Haw.) (granting preliminary injunction on Section 1 theory where agreement between newspapers would reduce competition in local newspaper market), *aff'd*, 203 F.3d 832 (9th Cir. 1999).

### A. Defendants' Exclusive Dealing Agreements Unlawfully Foreclose Authenticom from Competing in the Dealer Data Integration Market

In addition to Defendants' *horizontal* conspiracy, Authenticom is likely to prevail on its claim that CDK's and Reynolds' exclusive dealing agreements with dealers and application providers (vendors) are independently unlawful *vertical* agreements. Vertical exclusive dealing agreements are examined under the rule of reason. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393-94 (7th Cir. 1984). A vertical restraint unreasonably restrains trade if it precludes competition in a "substantial share of the line of commerce at issue." *Republic Tobacco Co. v. North Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004); *accord Marion Healthcare, LLC v. Southern Illinois Healthcare*, 2015 WL 3466585, at *5 (S.D. Ill. 2015) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). Substantial foreclosure occurs where: (1) the agreements are "likely to keep at least one significant competitor of the defendant from doing business in a relevant market," and (2) "the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition," that is, "that the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it." *Roland Mach.*, 749 F.2d at 394. Authenticom will show that both factors are met here.

### 1. *The Foreclosure Effect Is Substantial*

Defendants' exclusive dealing provisions with dealers prevent those dealers from giving Authenticom or other independent data integrators access to the dealers' own data. Likewise, Defendants' exclusive dealing provisions with vendors prevent those vendors from contracting with Authenticom or other independent data integrators to obtain access to dealer data. Both vertical restraints foreclose Authenticom from the data integration market, because without access to dealer data, Authenticom cannot provide data integration services to vendors.

That foreclosure is substantial: Authenticom is CDK's and Reynolds' largest remaining competitor, and CDK and Reynolds DMS customers represent more than 70 percent of all auto dealers in the United States.  *See also* Singer Decl. ¶ 57 (explaining that Authenticom is foreclosed from more than 70 percent of the market); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. 2016) ("Courts typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market to proceed with a claim."); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (per curiam) (recognizing the "roughly 40% or 50% share [foreclosure] usually required in order to establish a § 1 violation" due to market foreclosure); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 295, 309, 314 (1949) (seven leading oil producers with aggregate foreclosure of 65 percent); *FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 395 (1953) (aggregate foreclosure of 75 percent from four firms).  Even if Defendants' market shares are considered separately, both CDK (with 45 percent of dealerships) and Reynolds (with 30 percent of dealerships and certainly a higher percentage of dealer sales) foreclose a substantial portion of the market for integration services.

The foreclosure effects of Defendants' exclusive dealing restraints are exacerbated by the duration of the exclusivity provisions.  Defendants' dealer contracts are typically five to seven years in length, but, due to high impediments to switching, dealers typically stay with a single DMS provider for 20 years.  On the vendor side, CDK requires vendors to agree to an indefinite exclusive dealing arrangement – meaning that, once a vendor gets data through CDK's 3PA program, they can *never* get dealer data stored on the CDK DMS through a third party.  That is plainly unreasonable.  *See L. G. Balfour Co. v. FTC*, 442 F.2d 1, 14 (7th Cir. 1971) (manufacturer's exclusive dealing contracts "were found to be exclusive dealing arrangements of

long term, indefinite duration, and their accumulation and use were anti-competitive" under rule of reason).

## 2. *Authenticom Has Direct Evidence of Substantial Price Increases and Reduction of Output*

Authenticom can already prove that the probable effect of Defendants' foreclosure from the market is an increase in price above competitive levels. *See Roland Mach.*, 749 F.2d at 394. Authenticom has *direct* evidence of substantial increases caused by Defendants' exclusion of Authenticom from the market. As Professor Singer will testify, prior to the conspiracy, CDK charged approximately $70 per month for data integration services. *See* Singer Decl. ¶¶ 34-35, 48. Those prices were already higher than Authenticom, which charges, on average, $30 to $40 per month per dealership for the same aggregation services as CDK and Reynolds. SOF ¶ 239. Since the agreement, CDK has begun charging vendors monthly aggregation fees of between $250 and $300 per dealership (*i.e.*, per "rooftop") – and in some cases much more. *See* SOF ¶¶ 244-246; Singer Decl. ¶ 34. Reynolds similarly charges vendors $300 or more – and in some cases more than $800 per month per dealership. *See* SOF ¶¶ 242, 244; Singer Decl. ¶ 31. Vendors have little choice but to accept these vastly increased prices because the exclusive dealing provisions preclude dealers from authorizing the use of independent data integrators like Authenticom.

The evidence also shows that Defendants' anticompetitive conduct has reduced output. Under basic principles of supply and demand, it is a "reasonable assumption" that "integration activity declined as prices rose, which would represent a reduction in output." Singer Decl. ¶ 6. Authenticom's evidence supports this conclusion. *See*, *e.g.*, Declaration of Michael Korp (Open Recalls) ¶¶ 15-17 (May 12, 2017) ("Korp Decl.") (Defendants' blocking forced application provider Open Recalls to cut back service and curtail expansion plans); *id.* ¶¶ 26-32. Notably,

Authenticom's output – as measured by the number of "connections" it services between vendor and dealers – has declined sharply as a result of Defendants' blocking and anticompetitive tactics.  *See* Klein Report ¶ 22.  Through discovery, Authenticom can further quantify the industrywide reduction in output – such as through evidence of application providers purchasing less dealer data.

CDK and Reynolds have argued that their exclusive dealing clauses have pro-competitive benefits because they ensure the security of dealers' data.  But that concern cannot justify vertical exclusive dealing provisions that have the effect of forcing out all competition and substantially raising prices in the market.  As an initial matter, CDK and Reynolds have made no showing that Authenticom in particular or other data integration providers have inadequate security measures.  To the contrary, Defendants themselves are *still using Authenticom* to pull data for their own divisions and subsidiaries in a variety of contexts, including for their jointly owned subsidiary AVRS (an electronic titling and vehicle registration provider).  SOF ¶ 227.

Moreover, the data supposedly being protected is the *dealer's* own data about the *dealer's* own customers, inventory, and transactions.  Dealers are fully capable of protecting their data if they have a choice of data integration providers in a competitive environment.  *See* Declaration of Brian Maas, President of the California New Car Dealers Association ¶¶ 8-10 (May 15, 2017) ("Maas Decl.") (dealers are responsible for security of their data); *id.* ¶ 24 ("Dealers are sophisticated businesspeople capable of making informed decisions about . . . the data security protections of their business partners.").

Even assuming Defendants have a legitimate basis to impose security restrictions on access to dealers' data, that cannot possibly justify the drastic measure of foreclosing all competitors from the market and substantially increasing the price of dealer data integration

31

services for all consumers.  *See Wilk v. American Med. Ass'n*, 895 F.2d 352, 363 (7th Cir. 1990)

(affirming grant of injunction despite pro-competitive justification in part for failure of

defendants to establish there were no less restrictive alternatives to challenged conduct); *see also*

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997).  As Peter Swire confirms,

not only are there "no reasonable security and privacy concerns" to justify Defendants' actions,

but the use of independent integrators is exactly how other industries operate where the data is

much more sensitive, such as banking and healthcare.  Swire Decl. ¶¶ 15-33.

Moreover, there are numerous less restrictive alternatives here, including structured data

feeds or an application program interface for independent integrators (which is what CDK once

advocated before it entered into the illegal agreement with Reynolds).  SOF ¶¶ 54-55.

### B.     Defendants' Dealer Exclusive Dealing Provisions Constitute Illegal Tying

CDK's and Reynolds' exclusive dealing agreements with dealers also constitute unlawful

tying in violation of Section 1 of the Sherman Act.  A tying arrangement is an agreement by a

party to sell one product – the "tying product" – only on condition that the buyer also purchase or

agree not to buy from another supplier a second product – the "tied product."  *Eastman Kodak*

*Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992).  Such arrangements are unlawful

where sellers exploit their market power over one product to force unwilling buyers to deal

exclusively with the seller in the market for another separate product.  *See Jefferson Parish*

*Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool*

*Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006); *Northern Pac. Ry. Co. v. United States*,

356 U.S. 1, 6 (1958); *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953).

Defendants' exclusive dealing provisions explicitly condition the purchase of DMS

software (the tying product) on the dealers' agreement to use only Defendants' Dealer Data

Integration services (the tied product).  That condition forces dealers and the vendors they

contract with to purchase data integration services from Defendants, because vendors can obtain the access to the dealer data necessary to provide their services only by means of a data integration provider authorized by the dealer.  *E.g.*, Korp Decl. ¶¶ 6, 8.

That arrangement is classic unlawful tying.  *See Jefferson Parish*, 466 U.S. at 12 ("[T]he essential characteristic of . . . tying . . . lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer . . . might have preferred to purchase elsewhere on different terms.  When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."); *Eastman Kodak*, 504 U.S. at 461-63 (noting evidence "that Kodak would sell parts to third parties only if they agreed not to buy service from [independent service organizations]" as proof of a tying arrangement); *Northern Pac. Ry.*, 356 U.S. at 5-6 ("[A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer . . . agrees that he will not purchase that product from any other supplier.").

To prove that Defendants' tying constitutes a per se violation of the Sherman Act, Authenticom must show: (1) that two separate "products" are involved; (2) that Defendants have sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product; and (3) that the arrangement affects a substantial volume of interstate commerce.[10]  *See Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006); *Eastman Kodak*, 504 U.S. at 461-62; *Jefferson Parish*, 466 U.S. at 12-18.  Authenticom is likely to succeed in proving each of these elements.

---

[10] Even if these three factors cannot be met, the accused tying arrangement may still be found unlawful under the rule of reason.  *See Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 210 (7th Cir. 1985) ("[A] plaintiff's failure to state a *per se* illegal antitrust claim does not necessarily prove fatal to his case if he can state a claim under the rule of reason.").  As shown above, *supra* Part III.A.1, these agreements fail even under the rule of reason.

**First**, DMS systems are a separate and distinct product from dealer data integration services. Whether two products are distinct for the purposes of a tying claim "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19. As Professor Singer notes, "there is a demand for integration products, separate and apart from the demand for DMS and for apps." Singer Decl. ¶ 59. This can be seen directly in the market. Authenticom and other integration providers have offered dealer data integration services without also offering DMS software, and Defendants themselves have separate data integration products distinct from their DMS products. *See Eastman Kodak*, 504 U.S. at 462 ("For service and parts to be considered two distinct products," so as to support a "tying arrangement" claim under Sherman Act prohibition against restraint of trade, "there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."). Moreover, until their horizontal agreement not to compete, CDK provided data integration services to dealers using Reynolds' DMS system, and in fact still offers those services to non-Reynolds dealers. SOF ¶¶ 83, 90-91.

**Second**, as discussed above, CDK and Reynolds clearly have market power in the market for DMS software (the tying product). "[T]here are two ways of proving market power" – either (1) "through direct evidence of anticompetitive effects" or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Toys 'R' Us*, 221 F.3d at 937.

Here, there is direct evidence that Defendants have "the power to affect price or exclude competition" in the DMS market. *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003); *see K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405-06 (7th Cir. 2002) ("[t]he key

inquiry in a market power analysis is whether the defendant has the ability to raise prices without losing its business"). Defendants have successfully imposed significant price increases for DMS software – untethered to costs – without losing many dealers to rivals. *See* SOF ¶¶ 258-260 (Reynolds' and CDK's DMS contracts have price-escalation clauses). Moreover, the likes of Microsoft have tried – and failed – to compete with Defendants in the DMS market. Where a defendant has in fact controlled prices or excluded competition, "no more elaborate market analysis [is] necessary." *Toys 'R' Us*, 221 F.3d at 937.

In any event, market analysis confirms that Defendants have market power in the DMS market. As Professor Singer explains, the market for DMS software in the United States is a relevant geographical and product market. Singer Decl. ¶¶ 57-58, 68. CDK and Reynolds together have more than 70 percent of that market by rooftop and much more by vehicle sales. Furthermore, each of the Defendants, individually, controls a sufficient portion of the market to support a finding of market power for purposes of a tying claim. *See*, *e.g.*, *Visa*, 344 F.3d at 239-40 (upholding finding of market power where "Visa U.S.A. members accounted for approximately 47% of the dollar volume of credit and charge card transactions, while MasterCard members accounted for approximately 26%"). Defendants' market power is enhanced by the indispensable nature of DMS software, the lack of meaningful substitutes, and high costs of switching suppliers. SOF ¶¶ 1-16.

*Third*, Defendants' tying arrangements have affected a substantial amount of interstate commerce. "This element can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the favored seller; and (2) Is the quantity of interstate commerce affected not-insubstantial?" *Reifert*, 450 F.3d at 318. Here, the first question is easily answered: Authenticom remains a competitor to CDK and Reynolds in the tied

market.  As to the second question, the exclusive dealing provisions at issue are in every contract

CDK and Reynolds enter into with their DMS customers, which comprise more than 70 percent

of all dealerships in the United States.  *See* Singer Decl. ¶ 57.  Defendants' tying arrangement

clearly affects a "not-insubstantial" quantity of interstate commerce.

### C.  Authenticom Is Likely To Succeed on Its Section 2 Monopolization Theory

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the

possession of monopoly power in [a] relevant market and (2) the willful acquisition or

maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident."  *Briggs & Stratton Corp. v. Kohler Co.*,

405 F. Supp. 2d 986, 990 (W.D. Wis. 2005).

### 1.  *Relevant Data Integration Markets and Brand-Specific Aftermarkets*

The market for data integration services in the United States is a relevant product and

geographical market.  *See supra* p. 35.  In addition, the relevant market can be narrowed to the

brand-specific "after-market" in data integration services specific to CDK and Reynolds DMS

customers.  As the Supreme Court has recognized, secondary markets such as the market for data

integration services may appropriately be divided into brand-specific aftermarkets where there

are "significant information and switching costs" that impede consumers from switching

between brands.  *Eastman Kodak*, 504 U.S. at 473; *see id.* at 476 ("If the cost of switching is

high, consumers who already have purchased the equipment, and are thus 'locked in,' will

tolerate some level of service-price increases before changing equipment brands.").

That is precisely the case here: dealers face "high switching costs" and make significant

investments in the DMS software once they decide on a provider.  *See* SOF ¶¶ 1-16; Singer Decl.

¶¶ 64-66.  Moreover, information barriers (including the price secrecy provisions imposed by

Defendants, *see supra* pp. 14-15) prevent dealers from even *knowing* – let alone accurately

predicting over the course of a long-term contract – the costs of Defendants' dealer data fees. *See* SOF ¶¶ 166-169; Singer Decl. ¶¶ 64-66; Korp Decl. ¶ 22 ("When we entered into our long-term DMS contract with CDK, we had no idea CDK would take this position and would begin disabling and blocking our ability to provide vendors and other third parties of our choosing with access to our own data."). Indeed, the lock-in effects in the DMS market are far stronger than that in *Eastman Kodak* or other lower-court cases that have applied it.[11]

### 2. *Monopoly Power*

CDK and Reynolds have monopoly power in both the data integration market as well as their respective brand-specific aftermarkets. " '[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level . . . . [W]here evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear.' " *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2016 WL 6091244, at *7 (N.D. Ind. 2016) (quoting *Microsoft*, 253 F.3d at 51); *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012) (defining monopoly power as "the power to raise price above the competitive level without losing so much business to other sellers that the price would quickly fall back to that level"). Here, there is overwhelming evidence that CDK and Reynolds have successfully imposed massive price hikes on data integration services while actually *increasing* their market share through their successful campaign to drive out competition. *See supra* pp. 17-19, 30.

---

[11] *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (commercial copier equipment); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 988 (N.D. Cal. 2010) (Xbox 360 online game system); *Ward v. Apple Inc.*, 2017 WL 1075049, at *7 (N.D. Cal. 2017) (AT&T service plans); *Black Box Corp. v. Avaya, Inc.*, 2008 WL 4117844, at *10-11 (D.N.J. 2008) (office phone system); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F. Supp. 2d 861, 877 (E.D. Ky. 2007) (laser printers); *Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d 928, 935-36 (S.D. Ohio 2009) (Wendy's restaurant franchise); *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 1999 WL 1327396, at *5 (D.N.H. 1999) (Subaru car dealership).

### 3.     *Acquisition and Maintenance Through Anticompetitive Conduct*

Authenticom can already show that CDK and Reynolds acquired and maintained their "monopoly power through anticompetitive or exclusionary means." *Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011, 1019 (E.D. Wis. 1999). A monopolist abuses its power by using it to "foreclose competition, gain a competitive advantage, or destroy a competitor." *Id.* (citing *Eastern Kodak,* 504 U.S. at 482-83). "Anticompetitive or exclusionary conduct 'impairs the opportunities of rivals and is neither "competition on the merits" nor more restrictive than reasonably necessary for such competition.' " *Id.* (quoting III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 650a (rev. ed. 1996)); *see also Microsoft*, 253 F.3d at 58 (conduct violates Section 2 if it "harm[s] the competitive *process* and thereby harm[s] consumers"). Authenticom's evidence – that CDK and Reynolds entered into an unlawful horizontal market division agreement, conspired to exclude all other data integrators from the market, engaged in concerted activities to disrupt dealers' access to third-party integration services, and imposed draconian exclusive dealing arrangements and price secrecy provisions, *see supra* pp. 22-36 – is more than sufficient to show that Defendants obtained and are maintaining their monopoly power through anticompetitive means. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) ("Exclusive dealing arrangements are of special concern when imposed by a monopolist."); *Methodist Health Servs.*, 2016 WL 5817176, at *9 (it is anticompetitive for a "monopolist defendant" to "deploy[] exclusive contracts to limit completely their competitors' ability to access the market").[12]

---

[12] Authenticom will have no difficulty proving antitrust injury, because the same conduct that harmed Authenticom reduced competition and raised prices in the market for dealer data integration services. *See* Singer Decl. ¶¶ 47-53; *Rozema v. Marshfield Clinic*, 1997 WL 416292, at *9 (W.D. Wis. 1997) ("Because plaintiffs have alleged loss flowing from anti-competitive acts that affect consumer prices and restrict competition, they have alleged a cognizable antitrust injury."); *Blackburn v. Sweeney*, 53 F.3d 825, 830 (7th Cir. 1995) (antitrust laws are "intended to

**D.      Authenticom Is Likely To Succeed on Its Tortious Interference Claim**

In Wisconsin, tortious interference with contractual relations has five elements: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006).  Authenticom is likely to satisfy each element.

Authenticom has contracts with every dealer and third-party application provider with which it does (or did) business.  SOF ¶¶ 68, 70.  Defendants interfered with those contractual relationships by blocking Authenticom from providing integration services and by spreading false information about the security offered by Authenticom's products.  SOF ¶¶ 196-202, 213-230.  Because of that interference, many dealers and vendors ceased their relationship with Authenticom and switched to Defendants' integration products instead.  SOF ¶¶ 231-237.  That was not legitimate competition: Defendants used exclusionary tactics and outright misrepresentations to steal Authenticom's customers.

Defendants cannot establish that their interference was justified, for a wide range of reasons: (1) Defendants' interference violated federal antitrust law; (2) their actions were designed to reduce competition in the data integration market so they could charge monopoly prices; (3) such reduction in competition serves no social purpose (and instead inflicts substantial harm on customers); (4) the ostensible justification for their interference – vague and unsubstantiated security concerns – does not stand up to scrutiny and is inapplicable to Authenticom, which has an unblemished security record; (5) and Defendants' disparaging

---

prevent harms to competition, *i.e.*, higher prices and lower output resulting from collusion among competitors").

communications about Authenticom were demonstrably false.  *See Select Creations, Inc. v. Paliafito Am., Inc.*, 911 F. Supp. 1130, 1159 (E.D. Wis. 1995) (identifying factors to determine if interference was justified); *Magnum Radio, Inc. v. Brieske*, 577 N.W.2d 377, 381 n.4 (Wis. Ct. App. 1998) ("[I]mproper means of interfering with contracts include transmission of false information.").

## IV.   AUTHENTICOM IS SUFFERING IRREPARABLE HARM THAT MONEY DAMAGES CANNOT REDRESS

### A.   Defendants' Anticompetitive Conduct Threatens Authenticom's Viability

In the absence of relief, Authenticom will suffer irreparable harm because its business is on the verge of collapse as a direct result of Defendants' unlawful conduct.  Prior to CDK's and Reynolds' coordinated campaign to drive competitors out of the data integration market, Authenticom was a highly profitable company that grew from 18 employees to more than 120 since its inception in 2002.  SOF ¶ 63.  As President Obama recognized in mid-2015, Authenticom was "one of America's fastest growing private companies."  SOF ¶ 79.  It enjoyed robust growth in both revenues and earnings for five consecutive years (2010-2014).

Since Defendants entered into their unlawful horizontal conspiracy in 2015, however, Authenticom's business has been crippled.  Authenticom's business depends on its ability to reliably access dealer data stored on DMS systems.  Defendants' efforts to block Authenticom's access to dealers' data have impaired Authenticom's ability to service its customers, resulting in a loss of customers and a severe decline in revenue.  Defendants' conduct caused Authenticom's EBITDA to decrease by 77.22 percent since the third quarter of 2015.  SOF ¶ 272.

Those declines are so severe that the company has become "cash flow insolvent," meaning it lacks sufficient resources to satisfy its obligations as they become due.  Klein Report ¶ 28.  Defendants' efforts to drive Authenticom out of business have left Authenticom with less

40

than $361,000 in available cash and less than $2 million in other liquid assets at the time of this filing. *Id*. ¶ 30. These funds were insufficient to satisfy an $11 million principal payment on a promissory note from BMO Harris Bank due on April 16, 2017, as well as a $1,166,006 million tax-related obligation due April 18, 2017. *Id*. ¶ 29. Authenticom is also unable to comply with financial covenants governing its loan agreement with BMO Harris Bank. *Id*. ¶¶ 36, 38-39; *see also id*. ¶ 37 (WIPFLi LLP's March 10, 2017 "Independent Auditor's Report" noting that Authenticom and its affiliated companies "are in default on certain covenants of its loan agreements at October 31, 2016, primarily as a result of weakened financial results in 2016").[13]

Defendants' anticompetitive actions have prevented Authenticom from obtaining additional debt capital or refinancing its loan, as lenders have denied such requests due to concerns about the "continuing viability of the Borrower's [Authenticom's] business" in light of the "service disruptions" caused by Defendants and the resulting "declines in revenues." *Id*. ¶ 33 (quoting February 16, 2017 letter from BMO Harris Bank and February 20, 2017 letter from Citizens State Bank). Authenticom's outside auditor has expressed "substantial doubt" about whether Authenticom will be able "to continue as a going concern." *Id*. ¶ 37.

Defendants have also threatened Authenticom with increased enforcement of their exclusive dealing provisions with dealers and vendors. SOF ¶ 199. Defendants have already enforced these provisions against some dealers and vendors, and have threatened to more vigorously pursue legal and other remedies against dealers or vendors that deal with Authenticom. SOF ¶¶ 156, 170-172. In short, Authenticom has been foreclosed from serving the vast majority of its customers – more than 70 percent of all dealers rely on CDK or Reynolds for DMS software – and will soon be forced out of business.

---

[13] Authenticom received a limited 90-day forbearance (until July 15, 2017) from BMO Harris Bank pending the resolution of this preliminary injunction motion. Klein Report ¶ 29.

Evidence of "severe financial stress . . . that could ultimately force [a company] into insolvency," or evidence of a "risk to the organization's significant goodwill," supports a finding of irreparable harm for which there is no adequate remedy at law. *Girl Scouts of Manitou Council*, 549 F.3d at 1089, 1095 (finding irreparable harm where plaintiff was "[f]aced with drastically reduced revenue streams and fixed expenses," and money damages were inadequate because "there is a substantial risk . . . that Manitou . . . will lack the cash flow necessary to sustain the fixed costs of operating its business"); *see also Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[L]oss of goodwill, or eventual demise [of a business], qualifies as irreparable harm for which there is no adequate remedy at law.") (affirming district court's finding of irreparable harm where, in the absence of an injunction, the company would "go out of business in approximately 6 months," and noting that "a damages remedy may be inadequate if it comes too late to save plaintiff's business"). Injunctive relief is warranted to preserve Authenticom as a going concern.

### B. Authenticom Will Suffer Irreparable Harm to Its Reputation and Goodwill

Defendants' blocking tactics are also irreparably harming Authenticom's reputation and goodwill, causing it to lose customers it might never regain. Over the course of 15 years, Authenticom has steadily built up a reputation within the automotive industry as a leading provider of reliable and secure data integration services. In a matter of months, however, Defendants have caused vendors to question the sustainability of Authenticom's services.

Authenticom has experienced increasing cancellations by vendors and dealers that have made clear that their decisions were driven by Defendants' disruptions to Authenticom's ability to reliably provide data integration services. *See*, *e.g.*, SOF ¶ 233 ("This move was solely the result of CDK's aggressive and recurring disablement of our data access credentials for selected CDK dealership clients beginning August 1."); SOF ¶ 234 ("The effect of these [Defendants']

42

disruptions has taken a serious toll on our dealer business clients causing them to terminate or suspend marketing services with us.").  Authenticom has also experienced a loss of goodwill among existing customers, as numerous vendors and dealers have been outspoken in their frustration with Authenticom's inability to reliably access dealers' data as a result of Defendants' blocking efforts.  SOF ¶ 232.  If Defendants are permitted to continue their unlawful blocking tactics, Authenticom will continue to suffer losses of goodwill and customers that cannot be regained.  *See SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 927-28 (N.D. Ill. 2007) ("loss of customers" can constitute irreparable harm) (collecting cases); *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 (7th Cir. 1980) (loss of portion of clientele built during 20 years in business constituted irreparable harm).

Additionally, Defendants' public announcement that they will "complete the removal" of all "unauthorized third-party access methods" by early 2017 has sent a clear signal to prospective vendor and dealer customers that Authenticom's survival is in jeopardy.  SOF ¶ 199.  This has made it exceptionally difficult for Authenticom to attract new customers, as vendors seeking dealers' data stored on Defendants' DMS systems are understandably reluctant to hire a data integrator that Defendants have effectively blacklisted.  *See* Klein Report ¶ 41.

Defendants' ongoing destruction of Authenticom's existing and prospective customer goodwill constitutes irreparable harm for which money damages are inadequate.  *See Girl Scouts of Manitou Council*, 549 F.3d at 1089, 1095 (finding irreparable harm from loss of goodwill, for which "damages would be virtually impossible to compute"); *Gateway E. Ry.*, 35 F.3d at 1139-40 (loss of goodwill is "irreparable harm that is not compensable by an award of money damages").

Preliminary injunctive relief – in the form of an order preventing Defendants from blocking Authenticom's access to dealer data and from enforcing exclusive dealing provisions with dealers and vendors in order to block Authenticom – is critical to Authenticom's continued survival. This relief will allow Authenticom to retain its existing customers during the pendency of this case and possibly regain the ones it has lost. Moreover, such relief will directly impact Authenticom's ability to obtain financing to satisfy its outstanding tax and loan obligations. In short, free of Defendants' blocking tactics, Authenticom would be able to survive. *See*, *e.g.*, *Standard Oil*, 337 U.S. at 314-15 (affirming grant of preliminary injunction against exclusivity provisions of supply contracts).

### C.    The Balance of Harms and Public Interest Favor the Preliminary Injunction

The final step of the preliminary injunction inquiry "weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest." *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). With respect to the balance-of-harms analysis, an "injunction must do more good than harm . . . . How strong a claim on the merits is enough depends on the balance of harm: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). The public interest analysis concerns "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties." *Turnell*, 796 F.3d at 662.

**1.**    The balance of harms tips sharply in Authenticom's favor. Each passing day that Authenticom is subject to Defendants' exclusionary campaign, Authenticom suffers ongoing and severe harm to its business. Authenticom's situation is dire: if an injunction does not issue promptly, Authenticom faces the near certainty that its business will be destroyed and forced into

bankruptcy. *See supra* pp. 15-17, 40-41.  Moreover, Authenticom has already suffered – and continues to suffer – a massive loss of customer goodwill caused by Defendants' blocking tactics.

Conversely, Defendants would face no threat of harm if this Court issues a preliminary injunction, which would simply restore the state of affairs that existed before Defendants conspired and destroyed competition in the integration market.  In particular, CDK and Reynolds can continue to compete on the merits to provide data integration services to their dealers. Authenticom is asking for targeted, narrow relief – to restore and preserve Authenticom's ability to operate its business free from anticompetitive blocking.  That relief would not impinge on any of Defendants' legitimate business interests, as Defendants' supposed "security" concerns do not withstand scrutiny, *see supra* pp. 19-20, and dealers are fully capable of selecting secure data integrators, *see* Maas Decl. ¶ 24 (President of the California New Car Dealers Association – representing more than 1,100 dealerships – stating that "[d]ealers are sophisticated businesspeople capable of . . . evaluating the data security protections of their business partners").

**2.**     The public interest also strongly favors granting the preliminary injunction. Defendants' anticompetitive conduct is causing significant and ongoing harm to third parties, including application providers and dealers.

Vendors that once paid $40 or $50 per month for dealer data now pay $250 to $300 (and oftentimes much more).  SOF ¶¶ 239-246.  Defendants' extreme price increases not only take a severe financial toll on application providers, but also degrade the quality and availability of apps.  Singer Decl. ¶¶ 6-7, 47.  Indeed, if Defendants succeed in destroying Authenticom, application providers that cannot afford Defendants' data fees will be forced out of business

altogether.  *See* Korp Decl. ¶ 17 ("If Authenticom goes out of business, Open Recalls will go out

of business too.  There is no way we could afford CDK and Reynolds's certification fees.").

Notably, Defendants' anticompetitive conduct is harming auto dealerships – Defendants'

own customers.  Dealerships are being hit with pass-through integration fees, which are folded

into the cost of applications.  *See* Maas Decl. ¶¶ 18-21 ("vendors pass on most, if not all, of

[Defendants'] large data access fees to the dealers"); Declaration of Chris Longpre ¶¶ 7-8 (Apr.

4, 2017) ("Longpre Decl.") (dealer describing price increases); Declaration of Wayne Fitkin ¶ 18

(Mar. 22, 2017) ("Fitkin Decl.") (same).  And Defendants' constant blocking tactics are

interfering with dealerships' daily business operations and depriving them of choice in their

selection of business partners and data integrators.  *See* Korp Decl. ¶ 26 (CDK "blocking hurt our

business significantly" by impeding software applications vital to the dealerships); *see also*

Longpre Decl. ¶ 10 ("If I had my choice, I would use Authenticom's DealerVault service for all

of my vendors.  DealerVault is more cost effective and provides dealers with a secure system and

substantial control over their data, which CDK does not offer."); Maas Decl. ¶¶ 22-25

(importance of dealer choice); Fitkin Decl. ¶¶ 10, 14, 19.[14]

An injunction is also in the public interest because Authenticom is a vital part of the La

Crosse, Wisconsin business community, *see* SOF ¶¶ 279-281, and the jobs and livelihoods of its

120 employees are at jeopardy if Defendants' anticompetitive practices are not enjoined.  *See*

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 2011 WL 2473330, at *13 (C.D. Ill. 2011) (granting

preliminary injunction and citing public interest "in preserving a business that provides a

valuable product to the community and preserving jobs"), *aff'd*, 695 F.3d 676 (7th Cir. 2012);

---

[14] *See Central States, Southeast & Southwest Areas Pension Fund v. Breeko Corp.*, 1989
WL 153547, at *5 (N.D. Ill. 1989) (preliminary injunction was in public interest where it would
benefit third parties); *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 419 (N.D. Ill. 1994)
(same).

*Gannett Pac.*, 99 F. Supp. 2d at 1254 (granting preliminary injunction in antitrust case and noting that "the loss of competition" and "the loss of over 100 jobs would severely harm the public interest"); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC, & Local 9550 v. Cequent Towing*, 920 F. Supp. 2d 932, 942 (N.D. Ind. 2013) (public interest favored preliminary injunction where it would prevent the closure of local plant, saving jobs and protecting the tax base and local business community).  Finally, a preliminary injunction would put a stop to Defendants' anticompetitive collusion and promote the "public interest in free and open competition."  *Intertek USA Inc. v. AmSpec, LLC*, 2014 WL 4477933, at *7 (N.D. Ill. 2014).

## CONCLUSION

The Court should grant Authenticom's Motion for a Preliminary Injunction.

Dated:  May 18, 2017

Respectfully submitted,

*s/ Jennifer L. Gregor*
_____
Jennifer L. Gregor
Mark W. Hancock
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Phone: (608) 257-3911
Fax:     (608) 257-0609
Email: jgregor@gklaw.com,
        mhancock@gklaw.com

Michael N. Nemelka *(pro hac vice)*
Aaron M. Panner *(pro hac vice)*
David L. Schwarz *(pro hac vice)*
Kevin J. Miller *(pro hac vice)*
Derek T. Ho *(pro hac vice)*
Joshua Hafenbrack *(pro hac vice)*
Joanna T. Zhang *(pro hac vice)*
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:     (202) 326-7999
Email: mnemelka@kellogghansen.com
        apanner@kellogghansen.com
        dschwarz@kellogghansen.com
        kmiller@kellogghansen.com
        dho@kellogghansen.com
        jhafenbrack@kellogghansen.com
        jzhang@kellogghansen.com

*Attorneys for Plaintiff Authenticom, Inc.*