**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF WISCONSIN**

AUTHENTICOM, INC.

       Plaintiff,      Case No. 17-cv-318

  vs.

              Filed Under Seal

CDK GLOBAL, LLC; and THE REYNOLDS
AND REYNOLDS COMPANY

       Defendants.

**AUTHENTICOM'S STATEMENT OF FACTS**

**IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I. Dealer Management System Software and Services ............................................................1

II. Dealer Data Integration Services ......................................................................................2

    A. Dealer Ownership and Control of Their Data.........................................................4

    B. Authenticom...........................................................................................................5

    C. CDK's Data Integration Products ..........................................................................7

        1. Digital Motorworks and IntegraLink .........................................................7

        2. CDK's 3PA Program ..................................................................................9

    D. Reynolds Certified Interface Program ...................................................................9

    E. Former Data Integration Providers .......................................................................11

    F. Dealer Data Integration Market and Brand-Specific Aftermarkets ......................11

III. CDK's and Reynolds' Written Agreement Dividing the Dealer Data Integration Market and Single-Brand Aftermarkets.................................................................................12

IV. CDK's and Reynolds' Exclusive Dealing Arrangements with Dealers and Vendors ..................................................................................................................................13

    A. Defendants' Exclusive Dealing Terms with Dealers .............................................13

    B. Defendants' Exclusive Dealing and Price Secrecy Terms with Vendors ..............14

V. Defendants' Agreement to Block Authenticom from Accessing Dealer Data .................16

    A. Admissions of CDK and Reynolds Executives .....................................................16

    B. Coordination Among Defendants' Employees to Block Authenticom...................17

    C. Blocking by Defendants of Authenticom from Providing Dealer Data Integration Services .............................................................................................18

    D. Dealer Statements to Defendants to Stop Blocking Authenticom .........................18

    E. Defendants' False Statements About Authenticom's Security ..............................19

    F. Authenticom's Loss of Customers Because of Defendants' Actions .....................21

VI. Harm to Dealers and Vendors Caused by Defendants' Conduct .......................................22

A.      Defendants' Imposition of Large Price Increases in the Dealer Data
Integration Market ..................................................................................................22

B.      Defendants' Escalating Fees for DMS....................................................................23

C.      Additional Harm to Dealers and Vendors from Defendants' Conduct..................24

VII.      Irreparable Harm Suffered by Authenticom ......................................................................24

Pursuant to the Court's Procedures to Be Followed on Motions for Injunctive Relief, Plaintiff Authenticom, Inc. ("Authenticom") submits the following statement of facts on which it relies in support of its Motion for a Preliminary Injunction.[1]

## I. Dealer Management System Software and Services

1. Dealer Management System ("DMS") software is mission-critical software that every automobile dealership relies on to manage and direct its operations. Maas Decl. ¶ 4; Fitkin Decl. ¶ 2; Korp Decl. ¶ 21; Longpre Decl. ¶ 4.

2. The DMS is the center of a dealer's entire retail management platform and it is impossible to operate without it. Maas Decl. ¶ 4; Fitkin Decl. ¶ 2; Korp Decl. ¶ 21; Longpre Decl. ¶ 4.

3. There are no reasonable substitutes for the enterprise software and services provided by DMS providers to retail automotive dealerships. Singer Decl. ¶ 57; Maas Decl. ¶ 4; Fitkin Decl. ¶ 2.

4. CDK Global, LLC ("CDK") and The Reynolds and Reynolds Co. ("Reynolds") are the two dominant providers of DMS software and services to automobile dealerships in the United States. Maas Decl. ¶ 5.

5. Combined, CDK and Reynolds control more than 70 percent of the DMS market in the United States when measured using dealership rooftops (i.e., franchised stores). Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5.

6. Authenticom will show at the evidentiary hearing that CDK controls approximately 45 percent of the market and Reynolds controls approximately 30 percent. Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5.

7. Authenticom will show at the evidentiary hearing that when measured using the number of vehicles sold from franchised dealers, CDK's and Reynolds' market dominance is even more pronounced.

8. CDK and Reynolds sell their DMS software and services pursuant to long-term contracts, typically between five and seven years in length, often with automatic extensions if new services are ordered in the middle of the contract. Maas Decl. ¶ 6; Korp Decl. ¶ 19; Longpre Decl. ¶ 3.

9. It is difficult and disruptive for a dealer to switch DMS providers. Maas Decl. ¶ 7; Fitkin Decl. ¶ 3; Korp Decl. ¶ 19-20.

10. Switching DMS providers is so difficult because it disrupts and changes nearly every process that a dealer uses to operate. Maas Decl. ¶ 7; Fitkin Decl. ¶ 3; Korp Decl. ¶¶ 19-20; Ex. 6; Ex. 7; Ex. 8.

---

[1] Citations marked as "Ex." are Exhibits attached to the Declaration of Michael N. Nemelka in Support of Authenticom's Statement of Facts in Support of its Motion for a Preliminary Injunction.

11.     For a typical dealership to change DMS providers, it can take up to a year of preparation, staff training, and testing before the new system is put into operation.  Maas Decl. ¶ 7; Fitkin Decl. ¶ 3; Korp Decl. ¶¶ 19-20; Ex. 6; Ex. 7; Ex. 8.

12.     The financial costs of switching DMS platforms – in terms of training and implementation – are significant.  Ex. 3.

13.     One industry executive stated that changing DMS providers "is akin to a heart transplant."  Ex. 3.

14.     A large dealer publicly referred to changing DMS providers as "mission impossible."  Ex. 7.

15.     The average DMS client tenure is over 20 years.  Ex. 9, at 3.

16.     Microsoft Corp. tried to enter the DMS market in 2006 to compete with CDK and Reynolds, but failed.  In trying to take on CDK and Reynolds, a Microsoft executive publicly conceded, "[w]e kind of got ahead of ourselves."  Ex. 1.

## II.     Dealer Data Integration Services

17.     In the course of their operations, dealers generate important data, such as inventory, customer, sales, and service information.  Maas Decl. ¶ 4; Longpre Decl. ¶ 4.

18.     Dealers store their data on their DMS, which has a database component.  Maas Decl. ¶ 4; Longpre Decl. ¶ 4; Korp ¶ 21.

19.     Dealers use software "applications" that need access to the dealers' data in order to perform value-added services for the dealers.  Maas Decl. ¶¶ 9, 11-13; Longpre Decl. ¶¶ 6, 8, 9; Fitkin Decl. ¶ 5; Korp Decl. ¶¶ 6, 8, 11, 14, 22, 25-26.

20.     Popular applications include vehicle inventory management, customer relationship management, electronic vehicle registration and titling, scheduling service and repair appointments, lead generation, and many more.  Maas Decl. ¶¶ 11-12; Fitkin Decl. ¶ 5; Korp Decl. ¶ 25; Longpre Decl. ¶ 6.

21.     These applications perform services in addition to (or, in some instances, in replacement of) functions provided by the DMS software.  Longpre Decl. ¶ 6; Ex. 10.

22.     A single dealership rooftop typically uses ten or more separate applications. Ex. 11; Ex. 10; Ex. 8.

23.     Third-party application providers (called "vendors" in the industry) depend on and cannot provide their services without access to the data stored on the dealer's DMS database. Korp Decl. ¶¶ 8-9; Fitkin ¶ 5.

24.     For example, vendors that provide electronic vehicle registration and titling must be able to obtain purchaser, vehicle, and financing information about the sale of a car.

25.     Some applications – customer relationship management software, for example – not only require data "pulled" from a dealer's database, but also need to "push" data back in and therefore require "bi-directional" access.  Cottrell Decl. ¶ 12.

26.     Vendors obtain dealer data from data integrators.  Maas Decl. ¶¶ 14, 16-17; Ex. 10.

27.     Data integrators extract dealer data from the dealer's DMS database, aggregate that data and put it into a standardized format, and then deliver to vendors the specific data required for their applications.  Cottrell Decl. ¶ 9; Ex. 10.

28.     Data integrators also correct data-entry errors or anomalies in the data set.  Cottrell Decl. ¶ 9.

29.     Data integrators pull and deliver data in an automated, seamless way without the need for manual intervention by dealers.  Cottrell Decl. ¶ 9.

30.     While data access providers are commonly referred to as "integrators," there is no actual "integration" with the DMS database.  Instead, "integration" is simply a synonym for "data access."  Cottrell Decl. ¶ 11.

31.     CDK owns two of the largest dealer data integrators, Digital Motorworks, Inc. and IntegraLink, Inc.  Through these two subsidiaries, CDK provides data integration services for dealers that use non-CDK DMS systems.  Ex. 12; Ex. 13.

32.     CDK has an integration product – called the "Third Party Access" ("3PA") program – for dealers using the CDK DMS.  Maas Decl. ¶ 16.

33.     Reynolds has an integration product – called the "Reynolds Certified Interface" ("RCI") program – for dealers using the Reynolds DMS.  Maas Decl. ¶ 16.

34.     Authenticom will show at the evidentiary hearing that Reynolds does not have an integration product that pulls data from dealers that use non-Reynolds DMS systems.

35.     Authenticom introduced its data integration product in 2004, and the current version of the product is called DealerVault.  Cottrell Decl. ¶¶ 23, 29.

36.     Before a data integrator can pull data, it must get specific authorization from the dealer.  Maas Decl. ¶¶ 9, 15; Korp Decl. ¶ 25; Fitkin Decl. ¶ 9.

37.     For integrators like Authenticom, Digital Motorworks, and IntegraLink, dealers must set up separate login credentials for the integrators so that they can access the DMS database to pull the data.  Korp Decl. ¶¶ 10, 14, 26; Fitkin Decl. ¶ 9; Cottrell Decl. ¶ 24; Ex. 12.

38.     Once dealers set up login credentials, the data integrator automates the pulling of data through user emulation software, which uses the database software to run and capture the reports in the same way as a user at a dealership would.  Cottrell Decl. ¶ 25.

39.     Dealers authorize but typically do not pay integrators to pull their data.  Instead, vendors pay integrators for their data services.  Maas Decl. ¶ 18; Cottrell Decl. ¶ 61.

40.     The most sensitive data pulled by data integrators are names and contact information (such as home and email addresses).  Independent data integrators like Authenticom do not have access to the more sensitive categories of data such as social security and credit card numbers.  Cottrell Decl. ¶ 13.

## A.     Dealer Ownership and Control of Their Data

41.     The data on a dealer's DMS database belongs to the dealer.  Maas Decl. ¶ 8; Fitkin Decl. ¶ 4; Korp Decl. ¶ 21; Longpre Decl. ¶ 4.

42.     Tom Schwartz, Reynolds' chief spokesperson, publicly stated: "The data belongs to the dealers.  We all agree on that."  Ex. 4.

43.     On its website, Reynolds represents to dealers: "Your Data, Your Way.  You own your data.  Reynolds recognizes you need to share that data outside your dealership."  Ex. 14.

44.     Howard Gardner, CDK vice president over data strategy, stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."  Ex. 15.

45.     CDK's website states: "CDK has always understood that dealerships own their data."  Ex. 16.

46.     Reynolds' DMS contract states:

47.     CDK's DMS contract states:

48.     Steve Anenen, CDK's recently retired CEO, publicly stated that dealers have the right to grant third parties, such as data integrators, access to their data.  He told *Automotive News*: "We're not going to prohibit that or get in the way of that.  I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer.  As long as they grant permission, how would you ever go against that wish?"  Ex. 19.

49.     Matt Parsons, CDK's vice president of sales, publicly stated: "We're not going to limit the ability of a dealer to give an ID to someone else to, in essence, dial into their system.  That is the dealer's right.  We have no right to tell them they can't do that."  Ex. 20.

50.     Kevin Henahan, CDK's senior vice president of marketing, publicly stated: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data.  It's ultimately the dealer's data.  If he wants to give that data to somebody,

for us to try to charge a toll doesn't seem like the right thing to do.  So we're not going to go down this path."  Ex. 21.

51.     On February 2, 2007, the National Auto Dealers Association and American International Automobile Dealers Association, the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility."  The purpose of the statement was to "guide the use and protection of data in dealership management systems."  The joint statement set forth the following principles.  First, "[d]ealers should control access to the data stored in their dealership management systems."  Second, "[d]ealers, not dealership management system vendors or other entities, should have the sole right and the practical means to authorize third parties to access and extract dealer data."  And third, "[d]ealers expect all parties involved in storing and using dealer data to . . . [r]efrain from unreasonably impeding dealer-authorized access to dealer data."  Ex. 22.

52.     Individual dealers themselves have repeatedly made clear that they control who has access to their data.  Maas Decl. ¶ 9; Longpre Decl. ¶ 4; Korp Decl. ¶ 21; Fitkin Decl. ¶ 4.

53.     For example, a Lexus dealership in California stated that "[a]s a dealership owner, I believe that [DMS providers have] no right to deny me access to my own data.  By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security."  Ex. 23.

54.     A large coalition of dealers, application providers, data integrators, and DMS providers – including CDK and Authenticom – formed an industry group called Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used."  Ex. 24; Cottrell Decl. ¶ 16.

55.     The Open Secure Access group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."  Ex. 25.

**B.      Authenticom**

56.     Authenticom was founded in 2002 by Steve Cottrell.  Cottrell Decl. ¶ 1.

57.     Authenticom introduced its data integration service in 2004.  Cottrell Decl. ¶ 23.

58.     When Authenticom pulls dealer data, it formats the data into a consistent, usable format for third-party application providers.  Fitkin Decl. ¶ 7; Korp Decl. ¶ 7.

59.     Dealers specifically authorize Authenticom to pull their data.  Fitkin Decl. ¶ 9; Korp Decl. ¶ 25.

60.     Authenticom pulled dealer data from all of the available DMS platforms – including CDK and Reynolds – using the industry standard (login credentials provided by dealers).  Cottrell Decl. ¶ 25.

61.     Authenticom grew to serve 15,000 dealerships (out of approximately 17,000 franchised dealers nationwide) and nearly 500 application providers.  Cottrell Decl. ¶ 34; Ex. 26.

62.     As Authenticom grew, CDK and Reynolds did not interfere with Authenticom's pulling of dealer data from dealers' DMS databases.  Cottrell Decl. ¶ 34.

63.     From a single employee and $0 in revenue in 2002, Authenticom grew to a business with 120 employees and over $18 million in revenue in 2014.  Cottrell Decl. ¶¶ 2, 73; Ex. 27.

64.     The current version of Authenticom's data integration service is called DealerVault.  Cottrell Decl. ¶ 29.

65.      DealerVault provides a unified user interface where dealers are able to add, remove, or change the data sets that Authenticom pulls and sends to the dealers' vendors.  Cottrell Decl. ¶ 29.

66.     DealerVault also provides dealers with reports detailing the data Authenticom collected and to whom it was sent, all down to the granularity of a specific data field.  Cottrell Decl. ¶ 29.

67.     Many dealers prefer Authenticom's DealerVault service to the integration services of CDK and Reynolds because DealerVault allows dealers to easily manage and control how their data is used.  Fitkin Decl. ¶ 6; Longpre Decl. ¶¶ 5, 10; Maas Decl. ¶ 15.

68.     In Authenticom's agreements with dealers, the Terms and Conditions state that (1) Authenticom extracts only that data that the dealer has specifically authorized Authenticom to pull, *see* Ex. 28, § 3.4; (2) Authenticom sends data only to those vendors selected by the dealership, *see id.* § 5.3; (3) that Authenticom will not use the dealer data for any other purpose; and (4) that dealers maintain ownership over their data, *see id.*  In turn, dealers represent and agree that they have the right to grant Authenticom access to pull data from their DMS databases.  *Id.* § 7.1.

69.     Authenticom's standard pricing to pull data is $25 for the first data set, and then $50 for two or more (Authenticom can supply up to seven different data sets).  The average price per vendor to pull data is between $30 and $40 per dealership rooftop per month.  Cottrell Decl. ¶ 63.

70.     Authenticom's contracts with vendors have one-year terms (though vendors can cancel services at any time).  Cottrell Decl. ¶ 62.

71.     For bi-directional access – i.e., for data "pulled" from the dealer's DMS database as well as "pushed" back in – Authenticom has charged at most $75 per month for that bundled service, and that price included additional services such as data hygiene.  Cottrell Decl. ¶ 64.

72. Authenticom has a setup fee of $2,500 for its services, but that works as a down payment credited against the vendor's first invoices. Cottrell Decl. ¶ 65.

73. Authenticom's security protections and protocol are state of the art. Cottrell Decl. ¶ 30; Korp Decl. ¶ 7; Longpre Decl. ¶ 10; Fitkin Decl. ¶ 8.

74. Authenticom has never had a data breach and its firewall has never been compromised. Cottrell Decl. ¶ 30.

75. Authenticom transfers all data using secured and encrypted protocols that meet or exceed federal standards for federally insured banking transactions. Cottrell Decl. ¶ 30.

76. Authenticom partners with Microsoft Azure cloud services and has achieved Microsoft's top-level gold security certification three years in a row. Cottrell Decl. ¶ 31.

77. Authenticom's information security system exceeds applicable consumer privacy and protection restrictions, including the Gramm-Leach-Bliley Act of 1999 and the Federal Trade Commission's Implementing Rules. Authenticom's contracts with dealers guarantee compliance with those regulatory requirements. Cottrell Decl. ¶ 31.

78. Authenticom agrees to indemnify dealers in the event there is any data security event. In case such an event ever occurred, Authenticom has a $20 million cyber liability insurance policy. Cottrell Decl. ¶ 31.

79. President Barack Obama singled out Authenticom and Mr. Cottrell for praise in a speech in La Crosse, Wisconsin, on July 2, 2015. Among other comments, the President stated: "In 2002, Steve [Cottrell] started a small business out of his house to help manage data for car companies and dealerships." During the recession of 2007-2009, "Steve invested in new people, new technology, decided to double down, was absolutely confident his business model was right." When "the auto industry came roaring back, things began booming." "Steve's revenue is up 1000 percent. His company, Authenticom, has gone from 18 employees to more than 120. So this business that began in Steve's son's old bedroom is now one of America's fastest growing private companies based in a restored historic building right in downtown La Crosse." Ex. 27.

## C.     CDK's Data Integration Products

### 1.     Digital Motorworks and IntegraLink

80. Like Authenticom, Digital Motorworks and IntegraLink obtain authorization from dealers to pull data (using login credentials) and provide that data to vendors. Ex. 12; Cottrell Decl. ¶ 9.

81. CDK acquired Digital Motorworks in 2002, and stated: "As a result of its acquisition of Digital Motorworks, [CDK] now has the ability to extract, transform and standardize data from varied sources to client specifications." Ex. 29.

82.     CDK acquired IntegraLink in 2010.  Ex. 30.  IntegraLink "specialize[s] in the collection of data from automotive retailers' dealership management systems" using the same standard process.  Ex. 31.

83.     For over a decade before February 2015, CDK (through Digital Motorworks and IntegraLink) pulled data from Reynolds dealers' DMS databases using login credentials, instructing dealers to provide them with a "user ID, password, and store number with access to program 2213 & 6910 ([Reynolds] report generator).").  Ex. 13.

84.     For many years, Reynolds did not block CDK's access to dealer data – just as it did not block Authenticom and other dealer data integrators.  Ex. 12; Cottrell Decl. ¶¶ 34-35.

85.     Reynolds did not start blocking CDK and other independent integrators in earnest until 2011.  Ex. 32; Ex. 12.

86.     In 2011, Reynolds blocked and disabled CDK's usernames, disrupting Digital Motorworks' and IntegraLink's pulling of data.  As described by CDK to dealers, "Reynolds has instituted policies designed to prevent automated processes such as those used by IntegraLink, [Digital Motorworks,] and other third-party data-collection services from collecting data for programs you have enrolled in."  "In short," CDK explained, "when Reynolds and Reynolds blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform."  Ex. 12, at 1.

87.     To circumvent Reynolds' blocking, CDK rolled out a new solution called "SMART-R."  As described by CDK, SMART-R "automates the process of running [Reynolds DMS data] reports (7601/7602), captures and encrypts the output, and then securely transfers the data to IntegraLink" or Digital Motorworks.  Ex. 12, at 1.

88.     Robert Brockman, the owner and CEO of Reynolds, was asked about the fact that CDK "will not prohibit dealers from providing their vendors with a user ID and password to extract data."  Mr. Brockman responded: "I don't understand [CDK's] position.  Other than to be obstinate, than to be opposite, I can't imagine from a business standpoint that that's truly their position.  And frankly it would be my opinion that after awhile they probably change that position."  Ex. 33.

89.     In February 2015, Mr. Brockman's prediction became reality when CDK entered into an agreement with Reynolds to restrict access to dealer data.  Ex. 34; Ex. 35.

90.     After the agreement, CDK discontinued its data integration business for dealers using the Reynolds DMS.  Ex. 34; Ex. 35.

91.     Today, CDK – through Digital Motorworks and IntegraLink – continues to pull data from dealerships using non-Reynolds DMS systems.  Cottrell Decl. ¶ 57; Ex. 36.

92.     Authenticom will show at the evidentiary hearing that CDK charges vendors only $25 to $50 per connection for data pulled from dealers using non-Reynolds DMS systems.

## 2. CDK's 3PA Program

93.     CDK provides access to dealer data on the CDK DMS through its data integration product called the 3PA program.  Maas Decl. ¶ 16.

94.     Before February 2015, the 3PA program provided for "basic access" by which a dealer "supplie[d] third-party vendor[s] a user ID and password to access [the] dealership's system."  It also provided for "Third-Party Integration," which was data access obtained directly from CDK and included "real-time access" and a "bi-directional" interface.  Ex. 19; Ex. 16.

95.     CDK's prices for the third-party integration level of data access was approximately $70 per month per dealership rooftop.  Ex. 10.

96.     After CDK and Reynolds entered into their agreement in February 2015, CDK changed its 3PA program to match Reynolds' RCI program.  Ex. 10; Ex. 37.

97.     CDK now blocks dealers from granting third-party data integrators (like Authenticom) access to dealer data.  Cottrell Decl. ¶ 41.

98.     On average, CDK now charges vendors between $250 and $300 per connection, almost triple the $70 that it charged before for the same services.  Ex. 10; Ex. 38.

99.     For "bi-directional" access – that is, for both "pulling" data from the DMS and "pushing" data back into the database – CDK charges vendors up to $700 per connection. Ex. 10; Ex. 39.

100.    CDK announced the revamped 3PA program on June 22, 2015, as part of a "SecurityFirst" initiative.  Ex. 37.

101.    *Automotive News* reported: "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."  Ex. 10.

102.    *Automotive News* reported that vendors "in the CDK program . . . say the costs being charged far exceed the value of any increased data security."  Ex. 10.  One "vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security."  *Id.*

103.    Today, CDK declares that the 3PA program is the "only CDK-approved method [for] accessing" data on a dealer's CDK DMS.  Ex. 40.

104.    CDK labels any other method for accessing data – including through data integrators such as Authenticom – as "unauthorized."  Ex. 41; Ex. 42; Ex. 43.

## D.     Reynolds Certified Interface Program

105.    Reynolds provides integration services for dealers using the Reynolds DMS through its RCI program.  Maas Decl. ¶ 16.

106.     Robert Brockman acquired Reynolds in 2006.

107.     Before Mr. Brockman acquired Reynolds, Reynolds operated like all other DMS providers in the industry, taking the position that dealers were free to have data integrators pull their data in automated ways by using login credentials.  Cottrell Decl. ¶ 35; Ex. 44.

108.     After Mr. Brockman acquired Reynolds, Reynolds started to gradually disable the dealer-created login credentials used by independent data integrators to pull dealer data.  Cottrell Decl. ¶¶ 36.

109.     Reynolds first started disabling Authenticom's usernames in 2009, when it introduced "challenge questions" and "captcha" (where the user has to enter random blurred text) to make it more difficult to automate the pulling of data.  Cottrell Decl. ¶ 37.

110.     In 2011 and then again in June 2013, Reynolds intensified its tactics by disabling Authenticom's, CDK's, and other integrators' login credentials en masse.  Cottrell Decl. ¶ 38.

111.     Over a three-month period in the summer of 2013, Reynolds disabled 27,000 profiles used by Authenticom at over 3,600 dealers.  Cottrell Decl. ¶ 38.

112.     Reynolds' actions resulted in an almost complete collapse of Authenticom's integration business for dealer data for dealers using the Reynolds DMS.  Cottrell Decl. ¶ 38.

113.     Authenticom will show at the evidentiary hearing that, by blocking independent integrators, Reynolds transformed the RCI program into the exclusive method for automated access to data on the Reynolds DMS.

114.     Prior to the February 2015 agreement, CDK used Reynolds' blocking of data access as a marketing tool to convince dealers to switch DMS platforms, and some dealers did switch from Reynolds to CDK.  Ex. 21; Ex. 20; Ex. 19; Ex. 45.

115.     Reynolds charges between $300 and $800 per month (and oftentimes more) for access to dealer data.  Maas Decl. ¶ 18; Ex. 11; Ex. 10.

116.     Reynolds has a tool called "Dynamic Reporting," which is a non-automated function for dealers to manually generate a data report.  Cottrell Decl. ¶ 43.

117.     To use Dynamic Reporting, Reynolds dealers must manually generate the report (or reports), and then send the necessary data to a vendor every time the vendor requires the data for its application.  Cottrell Decl. ¶ 44.

118.     Authenticom has tried to help dealers cut down on the manual steps for using Dynamic Reporting, but the tool still requires a dealer's manual intervention.  Cottrell Decl. ¶ 45.

119.     The Dynamic Reporting tool is useless for applications requiring regular data feeds or bi-directional access to dealer data, and dealers do not have the personnel available to initiate the process multiple times per day.  Cottrell Decl. ¶ 46.

### E. Former Data Integration Providers

120.　The Dealer Data Integration Market once had numerous participants.  Cottrell Decl. ¶ 17.

121.　In this competitive market, vendors benefited from inexpensive, secure access to dealer data, and there was an explosion of innovation in applications that transformed how dealers conducted their business.  Cottrell Decl. ¶ 15.

122.　Other than Authenticom, CDK and Reynolds have systematically destroyed or driven them all out of the market.  Cottrell Decl. ¶ 17.  Examples are provided in the below paragraphs.

123.　Superior Integrated Solutions, Inc. ("SIS") was a leading data integration provider, but CDK and Reynolds excluded SIS from the market through blocking and litigation tactics.  Cottrell Decl. ¶ 18.

124.　SelectQu, which is owned by Dominion Enterprises, is another dealer data integrator that was forced out of the market.  In order to obtain approval for participation in the 3PA and RCI programs for Dominion's applications, CDK and Reynolds forced Dominion to agree that SelectQu would no longer pull data from their DMSs.  Cottrell Decl. ¶ 19.

125.　New Freedom Data Resources – founded in 1991 – was forced to shut down its data integration business in 2014 as a result of Reynolds' blocking actions.  Cottrell Decl. ¶ 20.

126.　The StoneEagle Group recently ended its data integration business in exchange for CDK and Reynolds allowing its data analytics application into the 3PA and RCI programs.  Cottrell Decl. ¶ 21.

127.　ProQuotes, Inc. was blocked by CDK from accessing dealer data stored on the CDK DMS, and as a result exited the data integration market.  Cottrell Decl. ¶ 22.

### F. Dealer Data Integration Market and Brand-Specific Aftermarkets

128.　Dealer data integration services is a relevant product market, as evidenced by the fact there is a demand for integration products, separate and apart from the demand for DMS and for apps.  Singer Decl. ¶¶ 59-63.

129.　The relevant geographic market for dealer data integration services is the United States.  Singer Decl. ¶ 68.

130.　There are no reasonable substitutes for services provided by dealer data integrators.  Singer Decl. ¶ 57.

131.　There are brand-specific aftermarkets for CDK's and Reynolds' respective integration services for dealers using their respective DMS platforms.  Singer Decl. ¶¶ 64-67.

132. CDK and Reynolds can profitably charge – and have charged – supracompetitive prices in the aftermarkets for dealer data integration on their respective systems. Singer Decl. ¶ 67.

133. CDK has a nearly 100 percent market share for dealer data integration services for dealers using the CDK DMS, and Reynolds has the same for dealers using the Reynolds DMS. Cottrell Decl. ¶ 67.

### III. CDK's and Reynolds' Written Agreement Dividing the Dealer Data Integration Market and Single-Brand Aftermarkets

134. Effective February 18, 2015, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement" whereby Defendants agreed that they would no longer compete in the Dealer Data Integration Market. Ex. 34; Ex. 35; Ex. 46.

135. In the agreement, CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS, ceding that ground exclusively to Reynolds. Ex. 34; Ex. 35; Ex. 46.

136. Reynolds already did not compete with CDK in providing access to data for dealers using the CDK DMS. Cottrell Decl. ¶ 55.

137. On May 7, 2015, Reynolds' lawyer sent Mr. Cottrell a proposed "Wind Down" agreement in an attempt to coerce Authenticom to exit the dealer data integration market. Ex. 47.

138. Robert Schaefer of Reynolds told Mr. Cottrell that the draft agreement Reynolds provided was word-for-word what CDK and Reynolds had agreed to a few months earlier. Cottrell Decl. ¶ 60.



139.

140.

141.

[REDACTED]

142. [REDACTED]

143. The agreement required CDK to give Reynolds full information about the vendors CDK served, including their name, contact information, contract terms, data pulling requirements, usernames used to pull the data, and more. Ex. 46, § 3.3; *id.*, Ex. A.

144. Consistent with their agreement, CDK stopped providing dealer data integration services with respect to Reynolds DMS dealers after the wind-down period. Ex. 34; Ex. 35.

145. Consistent with their agreement, CDK and Reynolds coordinated the transition of vendors from CDK to Reynolds. Ex. 34; Ex. 35.

146. CDK sent letters to its vendor clients announcing that it would no longer provide integration services for dealers using the Reynolds DMS, providing a deadline by when the vendors needed to enroll in the RCI program, and promising to assist the vendors in transitioning to the RCI program. Ex. 34; Ex. 35.

147. Reynolds followed up with its own letters to CDK's vendor clients as the Defendants transitioned customers from CDK to Reynolds. Ex. 48.

148. During the "wind-down" period, many vendors decided to leave Authenticom (which was being blocked) and join CDK (which was not being blocked). Cottrell Decl. ¶ 58.

## IV.    CDK's and Reynolds' Exclusive Dealing Arrangements with Dealers and Vendors

### A.    Defendants' Exclusive Dealing Terms with Dealers

149. In their DMS contracts with dealers, both CDK and Reynolds require dealers to agree that they will not provide anyone other than the DMS provider access to their data.

150.  [REDACTED]

151. These exclusive provisions last the life of the CDK DMS contract, which is a minimum of five years. Ex. 18.

152. While the CDK DMS contract bars dealers from granting data access to third parties, the agreement expressly provides that CDK is able to access the dealer's data. Ex. 18.

153. ████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████

154.　These exclusive provisions last as long as the Reynolds DMS contract, which is typically five to seven years.  Ex. 49.

155. ████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████

156.　CDK and Reynolds enforce the restrictive terms in their DMS contracts.  Ex. 50; Ex. 51.

157.　Many dealers do not realize that CDK and Reynolds have inserted the exclusive dealing provisions into the DMS contracts.  Ex. 51.

**B.　Defendants' Exclusive Dealing and Price Secrecy Terms with Vendors**

158.　The CDK 3PA and the Reynolds RCI contracts contain exclusive dealing provisions that prohibit vendors from obtaining dealer data from anyone other than CDK (through the 3PA program) or Reynolds (through the RCI program).



159. ████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████

160.　The penalty for accessing dealer data other than through CDK is termination. Ex. 52, § 6(g).

161. ████████████████████████████████████████████
███████████████████████████████████████████████████
██████████

162.　In order to police the exclusive dealing terms, the 3PA contract grants CDK audit rights to determine if the vendor has received dealer data from any other entity besides CDK. Ex. 52, § 5(d).

163. ████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████



164. 

165.     In order to police the exclusive dealing terms, the RCI contract grants Reynolds audit rights to determine if the vendor has received dealer data from any other entity besides Reynolds.  Ex. 53, § 6.2.

166.     CDK and Reynolds impose "Price Secrecy Provisions" in their 3PA and RCI contracts.

167. 

168.

169.     The Reynolds RCI contract also prohibits vendors from disclosing any terms or conditions of the contract – including the pricing paid for the data integration services – to any party, including dealers.  Ex. 53, § 2.5.3; *id.* § 2.7.

170.     CDK and Reynolds aggressively enforce the exclusive dealing provisions against vendors.  They punish vendors that obtain dealer data from any other integrator, impose large fines, threaten to cancel the vendor's contract, and initiate audits.  Ex. 54.

171. 

172.     Authenticom will show at the evidentiary hearing that CDK and Reynolds enforce the Price Secrecy Provisions, threatening vendors with claims of material breach and liquidated damages for referencing data access fees to any third party.

**V.      Defendants' Agreement to Block Authenticom from Accessing Dealer Data**

**A.      Admissions of CDK and Reynolds Executives**

173.     Senior CDK and Reynolds executives have admitted that CDK and Reynolds have entered into an agreement to restrict access to dealer data on their systems and drive out independent integrators like Authenticom.

174.     On April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Mr. Cottrell and said that they should "[t]ake a walk." Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area.  Cottrell Decl. ¶ 48; Ex. 55.

175.     Mr. McCray stated to Mr. Cottrell that CDK and Reynolds had agreed to "[l]ock you and the other third parties out."  Cottrell Decl. ¶ 48 Ex. 55.

176.     In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray stated that the number was so low because Authenticom's "book of [Reynolds] business is worthless to us because of the agreement between CDK and Reynolds." Cottrell Decl. ¶ 49; Ex. 55.

177.     Mr. McCray then stated: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems."  Cottrell Decl. ¶ 49; Ex. 55.

178.     Referring to the exclusive dealing provisions in the dealer DMS contracts, Mr. McCray stated that "[w]e will enforce our contract with dealers and sue them if needed to keep you out of our systems."  Cottrell Decl. ¶ 50; Ex. 55.

179.     Mr. McCray concluded by saying to Mr. Cottrell, "For god's sake, you have built a great little business, get something for it before it is destroyed otherwise *I will [ff]***ing destroy it*."  Cottrell Decl. ¶ 50; Ex. 55.

180.     Mr. Cottrell did not accept Mr. McCray's offer or threats.  Cottrell Decl. ¶ 51.

181.     Instead, Mr. Cottrell insisted that Authenticom would continue to serve its dealer and vendor customers.  Cottrell Decl. ¶ 51.

182.     Mr. Cottrell also took detailed notes of what Mr. McCray had said shortly after the conversation.  Cottrell Decl. ¶ 50; Ex. 55.

183.     The metadata for those notes provides that the document was created on April 4, 2016, at 10:41 a.m., and last modified at 11:20 a.m. that same day.  Ex. 55; Ex. 56.

184.     In May 2015, Mr. Schaefer – Reynolds' head of data services – told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data.  Cottrell Decl. ¶ 52.

185.     Mr. Schaefer said that Mr. Brockman was "adamant" that all third-party data integrators must be cut off.  Cottrell Decl. ¶ 52.

186.     Mr. Schaefer also said that he was in communications with other DMS companies to try to convince them to join CDK and Reynolds in the agreement to block independent data integrators.  Cottrell Decl. ¶ 52.

187.     Mr. Schaefer has not been successful in convincing other DMS providers to join CDK's and Reynolds' agreement to block independent integrators: every other DMS company either provides independent integrators with an API or permits dealers to provide login credentials.  Cottrell Decl. ¶ 47.

188.     The conversation between Mr. Schaefer and Mr. Cottrell was prompted by a threat by Reynolds to sue Authenticom for tortious interference.  Cottrell Decl. ¶ 59.

189.     On April 6, 2015, in a letter from Mr. Schaefer to Mr. Cottrell, Reynolds threatened to sue Authenticom for tortious interference.  Ex. 57.  The letter stated that because dealers were granting Authenticom authorization to pull their data, the dealers were breaching their DMS contracts and Reynolds intended to hold Authenticom liable as a result.  *Id.*

190.     On April 14, 2015, Mr. Cottrell sent a letter to Mr. Schaefer in response.  He rejected Reynolds' threat to sue and noted that "a significant percentage of R&R's [dealer] customers also are Authenticom's customers" and, like Reynolds, Authenticom and the dealers "have contractual agreements."  Ex. 58.

191.     On May 7, 2015, in response to Authenticom's letter, Reynolds' lawyer sent Mr. Cottrell a proposed "Wind Down" agreement pursuant to which Reynolds proposed that Authenticom would shut down its data integration business and, in exchange, Reynolds would stop blocking Authenticom's access to dealer data during the one-year wind down period. During that so-called "grace" period, Authenticom would be required to transition Authenticom's vendor clients into the RCI program.  Ex. 47.

192.     Authenticom rejected Reynolds' Wind Down proposal.  As Mr. Cottrell wrote to Mr. Schaefer earlier, instead of leaving the market, Authenticom was intent on providing "a safe and secure data movement option in a fair and competitive marketplace."  Ex. 58.

## B.     Coordination Among Defendants' Employees to Block Authenticom

193.     In December 2016, Steve French – CDK's senior director of client and data services – told Vince Rubino of TotalLoop that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out.  Ex. 59; Cottrell Decl. ¶ 53.

194.     Mr. French suggested to Mr. Rubino that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third-party data integrators like Authenticom.  Cottrell Decl. ¶ 53.

195.    Mr. French previously worked for Reynolds as its data collection manager. Cottrell Decl. ¶ 53.

**C.    Blocking by Defendants of Authenticom from Providing Dealer Data Integration Services**

196.    On August 1, 2016, CDK disabled Authenticom's login credentials at thousands of dealerships.  Cottrell Decl. ¶ 39.

197.    During this period, Authenticom's support services were overrun with dealers and vendors calling Authenticom frantic to find a way to re-establish Authenticom's connection and resume the flow of data that dealers had authorized.  Cottrell Decl. ¶ 39.

198.    Over the ensuing weeks and months after August 1, 2016, CDK repeatedly disabled Authenticom's login credentials for thousands of dealerships.  Cottrell Decl. ¶ 39.

199.    CDK informed dealers that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016."  CDK promised that in 2017 it would "further increase our security actions to prevent the use of unapproved data access methods."  Ex. 41, at 2.

200.    During this time, Reynolds' continued its blocking tactics as before.  Cottrell Decl. ¶ 41.

201.    Defendants constantly block – on a daily or even hourly basis – Authenticom's ability to pull dealer data by disabling the login credentials that dealers create for Authenticom. Fitkin Decl. ¶ 10; Korp Decl. ¶¶ 8, 10-11, 26-28.

202.    When CDK and Reynolds block Authenticom, vendors and dealers have their business operations interrupted.  Korp Decl. ¶ 26.

203.    Other DMS providers – i.e., DMS providers other than CDK and Reynolds – do not block the ability of dealers to share their data with Authenticom.  Korp Decl. ¶ 13; Cottrell Decl. ¶ 47.

**D.    Dealer Statements to Defendants to Stop Blocking Authenticom**

204.    A large number of dealers complained to CDK and Reynolds and demanded that they stop blocking Authenticom.  Ex. 51; Ex.. 60; Ex. 61; Ex. 23; Cottrell Decl. ¶ 79.

205.    In their complaints, the dealers have stated that the data is theirs, that they control access to it, and that the disabling of Authenticom has interrupted their operations and caused economic harm.  Cottrell Decl. ¶ 80.

206.    As examples of complaints from dealers, in December 2016, a Ford dealer protested to CDK: "You do not have our authorization to disable user accounts. . . .  It is my data and I decide who has access to it."  After CDK stated that it would continue to block Authenticom, the dealer wrote: "We own the data, CDK doesn't."  Ex. 51, at 1, 3.

207.     In November 2016, one Mercedes dealership in California wrote to CDK: "When will you stop the blocking of our user profiles?  This must stop."  The dealer criticized CDK's "attempt to stop all other data access [routes] thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data."  "When will CDK stop trying to monetize the data owned by [us] at our expense?  All being orchestrated under the guise of 'protecting our data.'  Frankly most . . . can see right through this propaganda smoke screen.  The data could be protected by using available technology that doesn't cut off the dealers['] access to their own data using fully automated routines."  The dealer explained: "We would like to purchase the XTime application.  The CDK data access charges make that option prohibitively expensive. . . . Did CDK actually think that these exorbitant data access charges levied against our third party solution providers would not get passed directly back to us?" Ex. 60.

208.     On October 27, 2016, a Wisconsin dealer wrote to Authenticom that it had created a login for the owner of the dealership "to see if CDK had the nerve to deactivate it.  They did! . . . I have very strongly voiced by phone to my CDK rep to STOP IT."  Ex. 61.

209.     On October 21, 2016, a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data.  By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security."  Ex. 23.  Regarding Authenticom's integration product, the dealer wrote that "with each vendor requiring different kinds of data extraction, I feel it would be far more effective to support Authenticom and DealerVault, to build a great single point of extracted data, and plug my vendors into their ecosystem." *Id.*

210.     After CDK and Reynolds disabled the dealer-created Authenticom credentials, dealers worked cooperatively with Authenticom to set up new credentials and reestablish access.  Given the sheer scale of the mass blocking, Authenticom was forced to redirect a majority of its 120-person workforce to the effort – including at one point hiring 50 temporary employees solely to help dealers navigate around the shutdowns.  Cottrell Decl. ¶ 40; Fitkin Decl. ¶¶ 10-11.

211.     As soon as dealers set up new login credentials, CDK and Reynolds disabled them.  Cottrell Decl. ¶¶ 40-41; Fitkin Decl. ¶ 10.

212.     As one Dodge dealer in Texas reported to Authenticom on September 9, 2016, the dealer's CDK "rep said that setting up a new profile would work for a day or two but our account is now being monitored.  Basically he told me that they have control and that is the way it's going to be."  Ex. 62.

## E.     Defendants' False Statements About Authenticom's Security

213.     In conjunction with disabling Authenticom's profiles, CDK and Reynolds have contacted dealers to convince them to have their vendors switch to the 3PA and RCI programs.  Cottrell Decl. ¶ 42; Ex. 41; Ex. 42; Ex. 43.

214.     On August 22, 2016, Bob Karp – President of CDK North America and the person with oversight of CDK's 3PA program – sent a letter to all of CDK's dealers served by Authenticom with the following message: "We are contacting you because your dealership has been identified as a client of a third party that is accessing your data through CDK systems by

unauthorized means." Mr. Karp stated that CDK would no longer allow independent data integrators to access dealer data, and vendors therefore needed to "begin the Third Party Access program application process immediately to avoid disruption." Ex. 41, at 1-2.

215. In another letter – this one from September 23, 2016 – Mr. Karp told dealers to "[s]hare your list of vendors with us so that our Third Party Access program team can invite vendors who are not already part of the program to join." Ex. 42.

216. Reynolds also notified dealers that it was "prohibiting automated access" to independent data integrators like Authenticom, and stated that "if a third party vendor you do business with is impacted by this change, please refer them to the Reynolds Certified Interface hotline." Ex. 32.

217. As part of their effort to convince vendors to join the 3PA and RCI programs, CDK and Reynolds have made false statements to vendors and dealers about Authenticom's data security. Ex. 41; Ex. 42; Ex. 43; Cottrell Decl. ¶ 54.

218. Defendants have tried to justify their blocking of Authenticom and other independent integrators by claiming that it is necessary to protect "data security." Ex. 41; Ex. 42; Ex. 43.

219. In letters to dealers, CDK has falsely stated that, with Authenticom, "there are no limits on data elements that can be accessed, increasing the risk of misuse. There is also an inability for you to track and monitor where your data is going." Ex. 42; Ex. 43.

220. Authenticom pulls only the data dealers specify, and with DealerVault, dealers have complete control and visibility over the flow of their data. Cottrell Decl. ¶¶ 24, 29.

221. CDK has also warned of "unauthorized software" being "installed on your CDK DMS system." Ex. 41, at 1.

222. Authenticom does not install any software on the DMS system or alter the DMS software; instead, Authenticom runs data reports just as the dealer can. Cottrell Decl. ¶ 54; Swire Decl. ¶ 27.

223. CDK and Reynolds have also stated that sharing through "data-handling intermediar[ies]" such as Authenticom poses security risks. Ex. 41, at 1.

224. The use of "intermediaries" like Authenticom does not pose a security risk that merits blocking all independent data integrators. Swire Decl. ¶¶ 6, 33.

225. Reynolds uses Authenticom to pull data from a handful of Reynolds' own dealerships for use in Reynolds' own applications. Cottrell Decl. ¶ 33; Swire Decl. ¶ 29.

226. Reynolds also uses Authenticom to pull data from non-CDK and non-Reynolds dealers for use in Reynolds' applications. Cottrell Decl. ¶ 33.

227.     AVRS, Inc. – a wholly owned joint venture of CDK and Reynolds that provides electronic registration and titling services for dealers in California – uses Authenticom for data integration services.  Cottrell Decl. ¶ 33; Swire Decl. ¶ 30; Longpre Decl. ¶ 9.  Therefore, on behalf of Defendants' own joint venture, Authenticom pulls data from CDK dealers and Reynolds dealers.  *Id.*

228.     Using login credentials to pull data is standard across industries, including in banking and healthcare, where the data is much more sensitive than anything accessible from dealers.  Swire Decl. ¶¶ 15-25.

229.     The Consumer Financial Protection Bureau recently summarized, "Typically, consumers provide their account credentials for a particular company or financial institution where they hold an account.  Those credentials are then used to obtain their account data through either: (1) A structured data feed or an application program interface (API) hosted by the company or financial institution, or (2) the company or financial institution's consumer-facing website in a process known as screen-scraping."  Ex. 63.

230.     "[S]creen scraping is the only technology that enables all of the thousands of small financial institutions to participate in the data-sharing ecosystem."  Ex. 64.

### F.     Authenticom's Loss of Customers Because of Defendants' Actions

231.     Because of Defendants' actions, vendors have had no choice but to leave Authenticom and join the 3PA and RCI programs.  Cottrell Decl. ¶ 78.

232.     The vendors could not sustain the business interruptions caused by Defendants' blocking, and so had to terminate their connections with Authenticom.  Cottrell Decl. ¶ 78.

233.     Among many examples, one large vendor wrote to Authenticom: "It is with reluctance that I write this email to confirm that we will be transitioning our CDK dealership clients from [Authenticom] to CDK."  The vendor explained that "[t]his move was solely the result of CDK's aggressive and recurring disablement of our data access credentials . . . .  Being forced to do business with CDK is distressing."  Ex. 65.

234.     Another longtime vendor client wrote to Authenticom: "After being a loyal client for over six years, we are compelled to make a business decision to pursue Third Party Access from CDK Data Services."  The vendor continued: "Over the past 60 days, we have averaged 100 of our dealer clients blocked from DealerVault/Authenticom polling the dealer's data. . . . The effect of these disruptions has taken a serious toll on our dealer business clients causing them to terminate or suspend marketing services with us."  Ex. 66.

235.     Another vendor explained that "[b]etween the Reynolds lockouts and the subsequent CDK lock-outs our business has contracted due to dealer cancellations."  Ex. 70.

236.     Vendors left Authenticom even though they preferred Authenticom's data integration services to CDK's and Reynolds'.  Ex. 66.

237.    One vendor wrote: "[The] process to onboard data via [Authenticom] is streamlined and much easier for both our company and the individual dealership.  Plus, the data accuracy and formatting is very consistent when it is secured . . . (this is not the case when data is pulled directly from CDK)."  The vendor also wrote that "the only party that truly suffers here is the actual dealer.  It takes us longer to provide them the services they are requesting and have paid for.  The data is not as clean, therefore requiring additional processes and data scrubbing, and appending tools to be applied on our side.  And the costs are greatly increased – literally double – due to the egregious fees that CDK charges."  Ex. 67.

## VI.    Harm to Dealers and Vendors Caused by Defendants' Conduct

### A.    Defendants' Imposition of Large Price Increases in the Dealer Data Integration Market

238.    Data integrators charge vendors per dealership rooftop, sometimes referred to as a "connection."  Thus, if a dealer has ten rooftops (i.e., ten individual franchises), then the vendor would need ten separate connections for that dealer.  Cottrell Decl. ¶ 10; Ex. 11.

239.    To pull data, Authenticom has consistently charged vendors $25 for one data feed and $50 for two or more (up to seven).  On average, Authenticom charges vendors between $30 and $40 a month per connection.  Cottrell Decl. ¶ 63.

240.    For bi-directional access to dealer data, Authenticom has generally charged $75 per connection.  Cottrell Decl. ¶ 64.

241.    Other independent data integrators charged similar rates to Authenticom.  For example, between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access (until it was forced out of the data integration market).  Cottrell Decl. ¶ 66.

242.    CDK and Reynolds now charge far higher rates than those charged by Authenticom and former data integrators.  Fitkin Decl. ¶ 17; Korp Decl. ¶¶ 27, 29; Longpre Decl. ¶¶ 5, 7-8.

243.    One prominent vendor paid Authenticom $35 per month to pull data; when it was forced to join the RCI program for data integration services, the monthly rate charged by Reynolds was $210, a 500 percent increase.  Cottrell Decl. ¶ 68.

244.    Another large vendor purchased data integration services from SIS for years, at a rate of $45 to $50 per month.  That vendor now pays CDK and Reynolds monthly charges of between $300 and $700 (CDK) and between $300 and $866 (Reynolds).  Cottrell Decl. ¶ 69.

245.    After entering into their agreement, CDK and Reynolds dramatically raised their data integration fees.

246.    Before entering the agreement with Reynolds in February 2015, CDK charged an average of $70 per connection.  Ex. 10; Ex. 38.  Since 2015, the average cost per connection has

risen to at least $250 to $300 (and often much more). *Id.* This constitutes, at the conservative end, an increase in the range of 250 to 325 percent in the price of data integration services. *Id.*

247. CDK's prices for the 3PA program stand in contrast to the prices CDK charges for data access to non-CDK dealers. Today, CDK (through Digital Motorworks and IntegraLink) charges between $25 and $50 per connection to non-CDK dealers, while it charges on average between $250 and $300 for the same services to CDK dealers. Ex. 10; Ex. 38; Cottrell Decl. ¶ 70.

248. CDK and Reynolds are also now charging many vendors a transaction charge for every data pull, imposing an additional per-transaction fee on top of their already large monthly fees. Cottrell Decl. ¶ 71.

249. In addition to monthly fees, CDK and Reynolds also charge vendors large upfront fees to initiate services.

250. Authenticom will show at the evidentiary hearing that CDK and Reynolds charge at least $30,000 to join the 3PA and RCI programs, with "setup" fees of around $300 (or more) per connection. Ex. 11; Cottrell Decl. ¶ 72.

251. Authenticom, by contrast, collects an upfront fee of $2,500, but that fee is credited against the first invoices, and Authenticom does not charge an additional per-connection setup fee as CDK and Reynolds do. Cottrell Decl. ¶ 65.

252. The industry press has widely reported on CDK's and Reynolds' dramatic price increases for integration services. Ex. 10; Ex. 39; Ex. 38.

253. Application providers pass through to dealers all or a portion of Defendants' higher data integration fees. Fitkin Decl. ¶ 18; Korp Decl. ¶¶ 27, 29; Longpre Decl. ¶¶ 7-8; Ex. 11.

254. As a result of the pass-through data fees, dealers pay more for third-party applications than they would otherwise. Fitkin Decl. ¶ 18; Longpre Decl. ¶ 7; Korp Decl. ¶¶ 27, 29-30; Ex. 11.

255. As one Florida dealer wrote: "This is just a means of revenue generation for CDK." "Let me, the client, worry about my data security by using a vendor such as DealerVault. It should be my choice on how I want to secure my data, not [Defendants']." Ex. 71.

## B. Defendants' Escalating Fees for DMS

256. CDK and Reynolds do not provide a corresponding price break to dealers in the form of lower DMS fees to make up for the higher pass-through costs for data integration.

257. Instead, the DMS fees paid by dealers continue to rise every year. Fitkin Decl. ¶ 18; Korp Decl. ¶ 24; Longpre Decl. ¶ 11.

258.     Authenticom will show at the evidentiary hearing that both CDK and Reynolds have fee escalation clauses in their DMS contracts with dealers.

259.     Authenticom will show at the evidentiary hearing that the standard Reynolds contract provides that DMS fees go up every year on March 1.  The price increase is measured by the Customer Price Index plus 2 percent.  Ex. 17, at 5.

260.     Authenticom will show at the evidentiary hearing that the standard CDK contract gives dealers price protection for a certain period of time, but then imposes an average 4 to 6 percent automatic yearly price increase thereafter.  Ex. 69, at 2.

### C.     Additional Harm to Dealers and Vendors from Defendants' Conduct

261.     Smaller application providers and startups cannot afford Defendants' data integration fees and cannot operate without affordable access to dealer data.  Korp Decl. ¶¶ 12, 17.

262.     Application providers are prevented from expanding and innovating because of Defendants' blocking tactics and high data integration fees – which deprives both car dealerships and the public of the benefits of those applications.  Korp Decl. ¶¶ 15-16, 28.

263.     Authenticom will show at the evidentiary hearing that CDK's and Reynolds' higher data integration fees reduce the quality and availability of applications from which dealers can choose.  Fitkin Decl. ¶ 19; Korp Decl. ¶¶ 28, 31-32.

264.     Beginning in 2015 and 2016, Defendants blocked the third-party application Open Recalls from pulling dealer data, impeding its ability to service its customers and expand.  Korp Decl. ¶¶ 8-11, 14-15.  The blocking has prevented Open Recalls from finding and contacting automobile owners who are driving vehicles with unsafe, recalled parts.  *Id.* ¶ 16.

265.     Dealers do not use some of their preferred vendors because of the large pass-through data integration fees.  Korp Decl. ¶ 31.

266.     There has also been reduced output in terms of fewer overall connections.  Singer Decl. ¶¶ 6, 47.

267.     Authenticom will show at the evidentiary hearing that because Defendants now charge some vendors an additional per-transaction fee, those vendors are economizing by reducing the output of data they receive.

### VII.     Irreparable Harm Suffered by Authenticom

268.     The same anticompetitive conduct that has injured competition has also directly and significantly damaged Authenticom.  Singer Decl. ¶¶ 47, 55.

269.     For years, Authenticom suffered customer losses and slower growth because of Reynolds' blocking.  Cottrell Decl. ¶ 76.

270.     The recent action of both CDK and Reynolds has accelerated Authenticom's losses.  Klein Decl. ¶ 15; Cottrell Decl. ¶ 77.

271.     Defendants' anticompetitive conduct threatens to destroy the entirety of Authenticom's business.  Klein Decl. ¶ 6; Cottrell Decl. ¶ 2.

272.     Authenticom's profits, as measured by EBITDA, dropped by 77.22 percent from the third quarter of 2015, when Defendants intensified their blocking efforts, to the first quarter of 2017.  Klein Decl. ¶ 20.

273.     The number of active data feeds that Authenticom has for vendors has declined significantly.  Klein Decl. ¶ 22; Cottrell Decl. ¶ 81.

274.     Defendants' actions have left Authenticom cash flow insolvent, with insufficient earnings and resources to satisfy its outstanding debt obligations.  Klein Decl. ¶ 28.

275.     Authenticom was unable to pay an $11 million principal payment on a loan from BMO Harris Bank due April 16, 2017, and has received a limited 90-day forbearance from the Bank pending the outcome of the forthcoming preliminary injunction motion.  Klein Decl. ¶ 29; Cottrell Decl. ¶ 83.

276.     Authenticom was also unable to pay an approximately $1.17 million tax-related obligation due April 18, 2017.  Klein Decl. ¶ 29; Cottrell Decl. ¶ 83.

277.     Authenticom has sought additional financing from, among others, BMO Harris Bank and Citizens State Bank, but they have declined to provide this financing, citing doubts about Authenticom's continued viability because of Defendants' actions.  Cottrell Decl. ¶ 83; Klein Decl. ¶ 33.

278.     The loss of goodwill – because of Defendants' blocking, Authenticom cannot perform for its customers – is incalculable.  Cottrell Decl. ¶ 85.

279.     Absent the emergency injunctive relief sought here, Authenticom will have no choice but to declare bankruptcy.  Cottrell Decl. ¶ 2.

280.     Upon learning of Defendants' harm to Authenticom, Jenny Kuderer of the Wisconsin Economic Development Corporation wrote  to the company: "[P]lease know that Authenticom is a valued contributor to the La Crosse Area and to the State of Wisconsin.  We wish you all the best in moving through this difficult time and regaining focus on your core business.  If there is anything that I, or our La Crosse Area Economic Development Team (cc'd here), may be able to do to assist, don't hesitate to reach out."  Ex. 72.

281.     Similarly, the City of La Crosse wrote to Mr. Cottrell: "On behalf of the City of La Crosse and the Planning and Development department, I want to echo the message from Jenny [Kuderer].  We are grateful for the contributions you and Authenticom have made to the community, have enjoyed watching you grow, and we look forward to continued future successes.  Please let us know if we can be of any assistance to you and your team."  Ex. 72.

May 18, 2017

Respectfully submitted,

*/s/ Jennifer L. Gregor*

Jennifer L. Gregor
Mark W. Hancock
GODFREY KAHN S.C.
One East Main Street
Suite 500
Madison, Wisconsin 53703
Telephone:  (608) 284-2629
Fax:  (608) 257-0609
jgregor@gklaw.com
mhancock@gklaw.com

Michael N. Nemelka (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
David L. Schwarz (*pro hac vice*)
Kevin J. Miller (*pro hac vice*)
Derek T. Ho (*pro hac vice*)
Joshua Hafenbrack (*pro hac vice*)
Joanna T. Zhang  (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Fax:  (202) 326-7999
mnemelka@kellogghansen.com
apanner@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dho@kellogghansen.com
jhafenbrack@kellogghansen.com
jzhang@kellogghansen.com

*Counsel for Plaintiff Authenticom, Inc.*